873 P.2d 66

David C. SCHUTTER, Attorney at Law, Applicant–Petitioner,

v.

The Honorable Melvin SOONG, Judge of the Circuit Court of the First Circuit, State of Hawai'i, Respondent.

No. 17282.

Supreme Court of Hawai'i.

May 2, 1994.

Brook Hart of Hart & Wolff, Honolulu, for applicant-petitioner.

Steven Michaels, Deputy Atty. Gen., Honolulu, for respondent.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

Attorney David C. Schutter (Schutter) petitions this court for a special proceeding to review his two convictions for contempt of court and for writs of mandamus and prohibition. Schutter contends that the convictions for contempt of court and sentences should be vacated because: (1) First Circuit Court Judge Melvin Soong (Judge Soong) failed to disqualify himself; (2) the actions for which he was cited with contempt did not constitute contempt; (3) Judge Soong failed to make an on-the-record determination of whether Schutter understood the contempt charges; (4) Judge Soong erred when he denied Schutter the right to pre-sentence allocution; and (5) the contempt of court sentences were unreasonably severe.

We agree only insofar as Judge Soong denied Schutter his right to pre-sentence allocution. Accordingly, we vacate the sentence against Schutter and remand for re-sentencing.

1. Arguments regarding the merits of *Aga* are

## I. FACTS

The contempt convictions in question arose during the civil medical malpractice jury trial of *Aga v. Hundahl,* Civil No. 91–2292.[1] During the course of the trial, Judge Soong cited Schutter, plaintiffs' counsel, twice for criminal contempt of court.

The record indicates that throughout the *Aga* trial, Schutter directed numerous "attacks" at Judge Soong. For example, on May 19, 1993, Schutter accused the court of having ruled on the basis of anger and prejudice and stated that the court was "leaning over backwards to try to help them [defendant and defense counsel] to violate every rule in this courtroom."

Later that same day, Schutter moved to strike an answer that he felt was a "speech." The court denied the motion explaining that both parties had made "speeches," and that the parties should "move forward." Schutter responded by stating in the presence of the jury that, "steamrollers move forward, your Honor, trials are supposed to decide questions."

The court, thereafter, called both counsel to the bench. During the bench conference, Schutter accused the court of "going out of [its] way to prejudice [plaintiffs] in front of the jury." The court put Schutter on notice that any comments he may have with respect to the court should be made at the bench. Schutter responded, "I just beg and pray that some day we get a fair trial in this case and I hate to have to have my client go through the expense of appeal and remand. Why not give it to us now?"

Schutter, however, continued to challenge the court, in the jury's hearing, on whatever perceived injustice he inferred from the court's rulings. Another example occurred later that same day during Schutter's cross-examination of a defense witness. Defense Counsel Dennis O'Connor (O'Connor) objected to Schutter's question regarding an answer in the witness' prior deposition. O'Connor stated that the question as asked by

presented to us in a separate appeal, No. 17330.

Schutter did not include the entire answer given in the deposition.

Schutter was asked by the court to read the answer. Schutter responded, "My God. Am I going to be subjected to this harassment throughout without any help." At this point, the court took a recess and asked to meet with both counsel in chambers. The following discussion ensued:

THE COURT: It is apparent, Mr. Schutter, that you are going to have outbursts and you're challenging the court when the court is trying to be fair to both parties. This last incident it would appear that you had exploded because of a comment by Mr. O'Connor that the portions weren't read. And as I understand it, you were intending to read the answer [in] part, but Mr. O'Connor was pointing out that that was not the complete reading of the question and the answer and you erupted.

SCHUTTER: That completely misstates what happened, Your Honor.

THE COURT: Well,—

SCHUTTER: I read the question which had already been read before. Mr. O'Connor stood up and said you haven't read the whole answer. I hadn't read any of the answer. Your Honor knew I hadn't read any of the answer. Mr. O'Connor knew I hadn't read any of the answer.

A false vicious statement was made to try to make the jury think that I had read less than a whole answer. And instead of rendering the assistance the court is supposed to render when asked to end that kind of shitty conduct, the court not only eschews doing its job, but goes back to the statement you've been making throughout ["]let's move ahead.["] And I know then we come into chambers and you completely misstate what happened.

The court felt it necessary to again place Schutter on notice that he control his temper. Schutter responded by putting the court on "notice" that he would continue to respond in the "appropriate manner" if the court contin-

ued to slant the record to favor the defendant. Schutter also accused the court and O'Connor of participating in a "two man con game" during bench conferences with O'Connor "telling" the court how to rule. He concluded with "Jesus Christ, judge. Let's have a fair trial. Stop trying your damnedest to influence the jury against me."

Despite being put on notice a second time, Schutter continued to challenge the court's authority. Thus, on the following day, May 20, 1993, the court issued a third warning to Schutter. Before issuing the warning the court excused the jury and took a short recess; the following then ensued:

THE COURT: Mr. Schutter, you have openly challenged the court in many instances throughout the trial. I have tried to counsel you, both at the bench and we had another session yesterday in chambers, if you do not like the court's ruling, voice your complaint at the bench and I have made that clear numerous times.

Despite such warnings you continue to openly defy the court, and therefore, I am placing you on notice and I will also advise your client, Mr. Aga, that the court, if this continues, may take further action because the court deems it is an imposition on the orderly procedure of the court and the administration of justice.

You can zealously defend or promote your client's interest, Mr. Schutter, but when you openly defy the court despite warnings against it, continue to do so before the jury, I am giving you a last warning. Cut it out, it's enough. And I will take further consequences should that type of behavior continue.

Have I made myself clear?

SCHUTTER: No, your Honor, you haven't.

Absolutely, I am on bended knee, and may the record reflect I am bending my knees, may I beg you for a fair trial, may I beg you to give us one percent of the consideration you're giving Senator O'Connor,[2] may I beg you to at least

2. Although not an order of the court, the court had previously asked Schutter to stop referring

come down off your cloud and get rid of your racial prejudices, whatever they might be, get rid of your hatreds and give us a fair trial.

So I'm not clear. You are warning and threatening me when you're the one whose [sic] behaving like a dictator, like an autocrat and like an extremely prejudiced, hosed, bought judge. When you stop that, your Honor, it would be easy for me.

I can't even ask a simple question in this courtroom any more [sic]. The jury is laughing at you and Senator O'Connor for making it impossible for me to even ask a question. And it's not like I am a novice at this, it's not like I don't know how to ask questions.

I have never been in a trial in my life where 25 objections in a row are sustained by a judge who doesn't have the slightest idea what in the hell Mr. O'Connor's talking about. But because it's coming from Mr. O'Connor, it's sustained before your Honor even has a chance to think about it.

So do you make yourself clear, your Honor? No.

Do I make myself clear that you're hosing us at every opportunity and that I have no idea where in God's name it started, and that I begged you to make a revelation to us like you should have before the trial started as to why you're so biased against us, I don't know whether it's because it's me, I don't know whether it's because Mr. Aga is Samoan, I don't know why you are biased and prejudiced but you have demonstrated it so clearly as to make it a revulsive [sic] experience for the jury to watch you cheat us, cheat us, chop us, cheat us.

Now my God, your Honor, I am human, you can only screw me so many times before I lose my temper.

THE COURT: And you can do the same to me, Mr. Schutter. So please have a seat.

SCHUTTER: Well you asked me a question, I was answering it, your Honor.

THE COURT: And I let you answer it, on the record.

SCHUTTER: I wasn't finished but you ordered me to sit down. I want to put on the record, your Honor, there's only been two judges who have ever—

THE COURT: Mr. Schutter, I asked you to please be seated.

SCHUTTER: And they were both—

THE COURT: All right. I have given you warning with respect to these matters.

Later, when Schutter became upset because defendant's expert witness was allowed to explain his answers, he stated in a bench conference:

I hate to say it, your Honor, but you have a duty not to me, not to my client but to the administration of justice to treat that like a real judge.

And a real judge, given that kind of crap from three defense witnesses in a row, would have had their heads, your Honor. Judge Fukushima, Judge Doi, anyone with any Kahones [sic] at all would turn to the witness and say answer the question or else.

Schutter's first contempt charge arose later that day when Schutter asked defendant's expert witness a question. O'Connor objected on the basis that the question had previously been answered in detail. After several arguments by both counsel, the court asked, "What are you asking him, Mr. Schutter?" The following then occurred:

SCHUTTER: Oh, God.

Judge, I guess the only way I can do it is directly to express it to you.

There's a 30 to 40 percent chance—

O'CONNOR: Excuse me, your Honor.

THE COURT: Not to me. You're asking—

SCHUTTER: Well you're the one who asked me. You just asked me.

THE COURT: Ladies and gentlemen, we're going to take a recess at this time.

to O'Connor as "Senator" O'Connor (O'Connor is a former State Senator).

And the record will reflect, Mr. Schutter, that you are yelling at the court.

SCHUTTER: Oh, that's not true. So why make your false record while the jury is still here, why don't you wait until they are gone.

May the record reflect the judge made those statements while the jury is still here.

THE COURT: The jury is still in the courtroom.

SCHUTTER: Thank you.

THE COURT: All right. The record will reflect that the jury is outside the presence of the courtroom. We'll have Dr. Richards also leave the courtroom.

All right. As far as the court's concerned, Mr. Schutter, the court has given you ample warning about challenging the court with respect to its rulings and this last episode with your outburst here in the courtroom on asking the court to make a ruling and the court telling you that the court's not going to make a ruling, you're asking the witness and your outburst, as far as the court is concerned Mr. David Schutter, I am going to charge you with the violation of section 710–1077(1)a) [sic] in that in the court's presence you have recklessly engaged in disorderly or contemptuous conduct and behavior directly tending to interrupt proceedings or impair respect to the court.

And with respect to 710–1077(3)(a) the court is treating this offense as a petty misdemeanor committed in the immediate view and presence of the court, or under such circumstances that the court has knowledge of the facts constituting the offense.

The Court, therefore, has the power to order summary conviction and disposition, the charge is a petty misdemeanor and the potential penalty shall not exceed 30 days in jail and/or a $1000 fine, accordingly. There is no right to a jury trial.

The substance of the charge is that you have engaged in continually challenging the court, the court has advised you at the bench, also in chambers, outside of the presence of the jury, and you continually challenge the court.

Therefore, this recent outburst is, again, an infringement upon the orderly procedure and justice of the court and the court is advising you subsequent to your last warning, the court is charging you with contempt for the outrage.

Do you understand the charges?

SCHUTTER: No, your Honor, I don't. You asked me what is the question and I started to respond.

You asked me, you, the judge, asked me what my question was to the witness and I tried to tell you what my question was to the witness and you're now announcing you're holding me in contempt for asking a question that you asked.

And then while the jury was asked to be excused but before they had left your Honor contemporaneously in my presence acted contemptuously of this entire proceeding by proceeding in front of the jury and you acknowledged that on the record.

So, no, I don't understand the charges, I don't even understand what in God's name you're talking about. You asked me what is the question. And I responded. And you held me in contempt. And that's ludicrous.

THE COURT: Well we are—I'm going to, as far as this matter is concerned, the charges are against you, I'm going to hold off until after this trial is had before the court proceeds further, but I have advised you with respect to the charges and what they were. And are.

SCHUTTER: May I say for the record, your Honor, that that is direct and intentional intimidation by the court designed to protect,

A, the court's incompetence, and B, the result you're attempting to obtain in this case, and where you've been bending over backwards trying to stick it to us as hard as you could, and to base your ruling on my asking—upon your asking me, check with the court reporter for God's sakes before you make a fool of yourself any more and find out that what

I said was in answer to your question, you asked me what is the question.

THE COURT: Mr. Schutter—

SCHUTTER: —make a fool of yourself.

THE COURT: This has been a continuing open defiance as far as the Court is concerned and, therefore, have charged you with contempt. We will handle the matter after this case is finished.

The first contempt charge, however, did not stop Schutter from continuing to challenge the court's authority. The court charged Schutter with a second count of contempt the following day. The charge arose after Schutter objected to O'Connor's question on redirect as being beyond the scope of the cross-examination. Both Judge Soong and O'Connor stated that they could not recall if it was beyond the scope. The following then occurred:

SCHUTTER: Well, I—you know, my word doesn't mean anything here—and you—

O'CONNOR: Objection.

SCHUTTER: —you and Mr. O'Connor can exchange words report back and forth.

Thereafter, the court excused the jury and took a short recess.

When the court reconvened the following proceedings were had in open court:

THE COURT: The Court wanted to take some time and to be sure that I give counsel the opportunity to explain the situation.

As I recall the what [sic] was going on, Mr. O'Connor was asking Dr. Richards something with respect to the hallucinations at Queen's and was asking some questions. And then Mr. Schutter objected and said that he had not gone into that area on cross and therefore, it was not a proper subject to be gotten into in the redirect.

I did mention that I did not recall whether Mr. Schutter had gone into this area on cross. As I recall, Mr. O'Connor said he didn't either. And somewhere in that area Mr. Schutter says well, my word doesn't mean anything here. And I think Mr. O'Connor object-ed. And at least the words I heard and what appeared to be directed to the Court is that you and Mr. O'Connor can exchange words. And at least the thought was before me that Mr. Schutter was implying that the Court was together with Mr. O'Connor. But the Court may have the wrong perception.

So I want to afford counsel the opportunity to give the court an explanation, if you wish to Mr. Schutter.

SCHUTTER: Yeah.... I will reconstruct for Your Honor what happened.

Mr. O'Connor asked a question in a totally improper area of redirect examination. I objected and flatly stated that I had not gone into it on Cross Examination.

I'm amazed because in every other court I practice in courts take my word for things as an officer of the court. And this is the only court I've appeared in since Judge change [sic] retired where my word wasn't taken and where I was called a liar and made fun of and made a fool of in front of the jury by the court.

So when the court said I don't remember that or I don't know and then looked not at me, but at Mr. O'Connor and Mr. O'Connor said I don't know either for a perceptible period of time of at least ten or fifteen seconds Your Honor simply kept looking at Mr. O'Connor and Mr. O'Connor kept looking at you making it crystal clear to the jury that the decision was going to be made between the two of you and that somehow one of you had dropped the ball and that the script had been forgotten and maybe we'd even have to approach the bench between the two of you to decide what to do now with this obstreperous lawyer who had the audacity to say that he knew something as a fact. And rather than relying on my stating that it's a fact, the Court said I don't know meaning I don't accept what Mr. Schutter says and I don't know, turns to Mr. O'Connor, Mr. O'Connor says I don't know and rather than ruling continues to look at Mr. O'Connor like what are you and I going

to do, Mr. O'Connor, which is the clear connotation of what you did.

And so I said what I said and I probably shouldn't have, but, you know, I'm human. And I've heard lots of stories about Your Honor intimidating and brow beating lines people and officials during the lawyers volleyball league so I know how bad you can be, but you've done it worse than that in this trial. You've hosed me from beginning to end. And I'm afraid I have to put the blame back where it belongs, Your Honor.

When you do a Laurel and Hardy, Abbott and Costello, Alfonce and Gastan [sic] routine with Mr. O'Connor on my head with your tap shoes, I'm afraid I'm going to have to respond.

So I mean the whole procedure has turned into a joke anyway. You've drilled holes into my head with your tap shoes. You might as well keep on doing it. But don't expect me to sit quietly by and tolerate it, Your Honor. I mean farce is supposed to be broad comedy and there's nothing funny about this although it is a farce. You're just making a joke of me, of my case, of justice, of the American way and I be dammed if I know why. But it sure as hell is obviously personal.

And I resent Your Honor terminating the proceedings every time you get caught intentionally screwing up badly and sending the jury out so that it reflects on me. And the last time you did it you made comments about me while the jury was going out.

And when I try to put on the record the conduct of the court, the conduct of Mr. O'Connor's witnesses, I'm not even allowed to put on witnesses during the recess to prove what you're doing. And I've only had one other judge in my entire career who ever tried to protect his record by not letting me even show what he was doing. And you should be ashamed to be following in the foot steps [sic] of Judge Chang.

I have nothing further to say, Your Honor.

THE COURT: All right, then, Mr. Schutter, I'm going to charge you with Contempt in violation of HRS 710–1077(1)(a) back in the Court's presence you have recklessly engaged in disorderly or contemptuous behavior, directly tending to interrupt the proceedings or impair respect due the court.

And the Court is treating this offense as a petty misdemeanor in the immediate view and presence of the court.

The Court, therefore, has the power to order summary conviction and disposition. The charge is a petty misdemeanor and the potential penalty shall not exceed 30 days in jail and/or a fine of a thousand dollars. Accordingly, there is no right to a jury trial.

And the substance of the charge is that you engaged in the following behavior: In your statement that while your word doesn't mean anything here and that you and Mr. O'Connor can exchange words implying that the court is in together with Mr. O'Connor or the implication of that type of a charge. And therefore, that is what the court is charging you with.

Do you understand the charge, Mr. Schutter?

SCHUTTER: No, Your Honor, I don't.

THE COURT: All right. Well, I think the record will reflect that is sufficiently clear to you and I will put off moving forward on this matter until the trial is finished.

This second contempt charge did not deter Schutter from continuing to attack the court. Schutter continued to accuse the court of attempting to make a fool out of him. Schutter also challenged the court by stating, "You want to play games, Your Honor, I can play games too."

This behavior even continued while counsel discussed the jury instructions with the court. When the court accepted a jury instruction over Schutter's objection, Schutter stated:

Realizing that you haven't been able to beat us yet, no matter how hard you've tried, maybe I can screw up the instruc-

tions and the verdict form enough to screw us there.

I mean the Intermediate Appellate Court has given you a specific direction and you are saying no, let's confuse the jury instead.

God, it's a joke.

The court, however, did not cite Schutter with any additional counts of criminal contempt. At the conclusion of the trial, on May 28, 1993, the court attempted to proceed with the two contempt charges against Schutter. Schutter, however, requested a continuance.

Schutter also informed the court that by seeking a continuance he was not attempting to waive any arguments, and thereafter, informed the court that he intended to file an affidavit of bias and prejudice to disqualify the court from handling the contempt proceedings. The court then informed Schutter that it intended to hear the matter pursuant to *Evans v. Takao*, 74 Haw. 267, 842 P.2d 255 (1992). The court then granted the continuance.

After the court granted the continuance, Schutter again asked that the court withhold its ruling until he had an opportunity to obtain counsel and until the court heard his motion to disqualify. The court scheduled the proceedings to take place in two weeks, as requested by Schutter.

Later, on June 4, 1993, the court, at the request of Schutter, continued the matter to June 18, 1993. Schutter's office was notified by telephone and reminded to file the motion for disqualification before the hearing date. Schutter, however, did not file a motion to disqualify the court until after the court held a hearing on the contempt charges.

At the June 18, 1993 hearing, Schutter was represented by James Duffy (Duffy). The proceedings began with Judge Soong reading the basis for the first charge against Schutter. The court then stated, "Mr. Duffy, do you understand the charges the Court has brought against Mr. Schutter; and do you wish to be heard on the merits of this matter?" Duffy responded, "No, we don't. We feel that what's yelling to one person, perhaps, is not yelling to someone else. But we do not choose to contest either of the two charges, Your Honor." The court, then held Schutter guilty of Direct Summary Criminal Contempt of the Court.

The court then read the charge for the second count. The court stated that Schutter had shouted his implication that the court was working with defense counsel. When Duffy was asked whether he understood the charge, he responded that he understood the charge, but that the transcript did not reflect any shouting. The court agreed and limited the charge to the implication that the court was favoring the defense. Duffy again stated that the charge was not contested. Accordingly, the court held Schutter guilty of Direct Summary Criminal Contempt of the Court.

Before sentencing began, Duffy requested that he be heard on the sentencing. The court responded that it would allow Duffy to speak after sentencing. Thereafter, the court sentenced Schutter to four days of incarceration for the first count and eight days for the second count.

Duffy was then allowed to speak. In his statement, Duffy attempted to explain that Schutter's behavior was due to his attempt to help the Aga family. Duffy also asked that the court reconsider its sentence. Schutter was then allowed to speak. The following ensued: [3]

> SCHUTTER: To be bluntly honest, Your Honor, I'm somewhat put off and angered that I was not given the opportunity to speak, as the Supreme Court of the State of Hawaii and all forms of justice require, before sentence was imposed upon me. And I was sitting there pulling at Mr. Duffy's sleeve begging for a recess so that we could talk over what we were doing, when Your Honor actually went ahead and imposed sentence without having heard from either my counsel or me, despite the right of elocution [sic] spelled out in the case that

3. In all fairness to the parties, and to ensure that the statement is not taken out of context, Schutter's statement is quoted in its entirety.

Your Honor brought to our attention, the First Evidence Case [sic], and which I know Your Honor to be familiar with.

I guess that sums up my problems with Your Honor. I just don't understand what's happening. And that means, I must be pretty dumb. I'm now speaking to you after you've imposed sentence, even though every vestige of Western civilization from the beginning has talked about the defendant's right to be heard before sentence, not after. But when I challenge that, Your Honor gets mad, just as when I challenged all of the other errors in the trial. You got mad. And it spells out, Your Honor, exactly what we're talking about.

You charged me with two counts of contempt. And when you went to read the second—when you read the first count of contempt, you read it right out of the record the way you said it happened. When you got to the second count of contempt, you didn't read it right outside the record. And Your Honor saw me desperately whispering to Mr. Duffy wondering why in God's name you were changing the charges and saying that I had yelled something when I never yelled it. You know I didn't yell it, and you never said at the time that I yelled it. So giving me full and fair notice of the charges, you simply changed them on the day of the sentencing.

I guess I just don't understand why judges have to be that way. But be that as it may, Your Honor, I want to explain to you why I'm not contesting the charges. And I think I owe you an explanation of that.

First, I am not not contesting the charges because I'm guilty of them. I'm not. In both counts of contempt that you have charged me with, I am absolutely innocent as the driven snow. And that's why you found it necessary to falsify the second charge here today. First, you take a recess to make sure that the television cameras are working because it was part of your concern to make sure that this was televised.

The note that was sent up to you where you said you had to take a recess was actually a note from the TV people saying they needed to plug in because their sound wasn't working. And you took a recess while I'm sitting here sweating and suffering under this incredible pressure that you've put me under, but it's more important for you to have TV sound for your speech than it is to pay any attention to my rights.

Now, that's not important. My rights really don't mean anything. But during the trial, what I was concerned about was Mr. Aga's rights. And the reason I'm not contesting, your Honor, is that there are in the transcript a number of instances where I did do things which in my opinion and hindsight were contemptuous and for which I am deeply sorry and for which I apologize to the Court. And I simply don't feel that it's fair for me to plead not guilty and tie up the Court's system of the State of Hawaii through the Intermediate Appellate Court and the Hawaii Supreme Court on a petty misdemeanor involving me. I'd rather spend the Court's time dealing with the rights of the citizens and the community, rather than dealing with my rights and whether they've been trample [sic] upon.

Since I did in fact commit contempt during the trial, I don't feel that I should contest the two charges that you've levied against me—even though both of them are wrong; even though I'm not guilty of either; and even though, as Your Honor carefully neglected to read while reading from the transcripts, I denied each charge on the record immediately after it happened.

On the first charge, you said I was yelling. I pointed out to you that although you'd excused the jury, you didn't wait for the jury to leave the room. You made your charge against me that I was yelling while the jury was still here. And I insisted that we put that on the record.

THE COURT: And we did.

SCHUTTER: And I described it as a false charge, Your Honor. I said that I was not yelling. So I go to look at the law books, and I find that what Your Honor did to me at the end of the trial is for some God awful reason supported by the Hawaii Supreme Court. That is, I couldn't have a fair trial in this matter.

I didn't yell. Your Honor says on the record I yelled, and you managed to poison the jury by falsely stating that I've yelled. But I didn't yell. And I could call 50 witnesses who know me well enough to know when I'm yelling and when I'm not. If I had been yelling, you would have witnesses from the other end of the courthouse who would have heard me. And in fact, nobody covered their ears. Nobody was offended, except you.

I didn't yell. But how do I have a trial on that? When I informed Your Honor after the trial—When you attempted to proceed immediately and without allowing me time to get counsel or prepare my defense, I informed you that I'd be filing an affidavit of bias and prejudice to disqualify you and you informed me without ever seeing the affidavit that you would deny them. And you said that on the record.

So now I'm sitting here faced with two charges which are false—of which I'm not guilty.

THE COURT: Why don't you retract what your attorney said and let's go forward.

SCHUTTER: Because I can't have a trial. That's what I'm trying to tell Your Honor. And again, just like during the Aga trial, you're not hearing anything I say.

I'm saying that you told me that the only trial I could have was before you. Yet, you're the witness. You're the one who says I'm yelling. I'm the one who says I wasn't. And in the American System of Justice, if I say that Your Honor is biased and you say you're not, in every other instance except this, somebody else decides. But in this instance, you say I was yelling I say I wasn't; I say you're biased, you say you're not, and guess what?

THE COURT: Take this matter up. It's not appealable, but you can apply for an extraordinary writ or review. You still have that process.

SCHUTTER: But Your Honor has explained to me, braggingly [sic]—

THE COURT: I haven't bragged to you at all, Mr. Schutter.

SCHUTTER: Fine, Your Honor.

THE COURT: And Mr. O'Connor can verify whether you were yelling at the Court or not.

SCHUTTER: Mr. O'Connor could verify that. And in a fair trial, Mr. O'Connor would do it before some other judge.

THE COURT: The jurors could be asked as to whether you were yelling or not.

SCHUTTER: They can all be called as witnesses. The problem is not who the witnesses are, Your Honor. The problem is who the fact finder is. And you're saying that although you're the accuser and although you're the witness, you should be the fact finder. And when I told you that we'd be filing an affidavit of bias and prejudice, you told us, "I'm not biased and I will be the fact finder, and I will determine it."

Now, I'm trying to—

THE COURT: As stated by the Evans case, the Supreme Court said that if the judge were such that he or she displayed judicial temperament and the matter was handled properly without animosity on behalf of the judge, the judge could hear it. And you can still file whatever you want to file, Mr. Schutter.

SCHUTTER: You know, Judge, I started out by pointing out that I had a right to be heard before the imposition of sentence and not after. Now, you're not even permitting me to make my elocution [sic], even at the wrong time.

THE COURT: All right.

SCHUTTER: If I might, Your Honor, I would like to have you listen and let me say what I have to say, then you can do what you have to do.

"During the week of May 10th, 1993, I was at the courthouse to observe any trials that might be in progress. I wandered into a courtroom where a case named Aga vs Hundahl was in progress. At the time I entered the courtroom, I did not know anything about the case or either party.["]

"I watched the Aga vs. Hundahl trial for several days. During that time, it became very obvious to me that for some reason, the judge presiding over the trial did not like plaintiff's counsel. The comments, expressions, and verbal intonations of the judge strongly communicated dislike of plaintiff's attorney.["]

"I was surprised by this open animosity of the judge towards plaintiff's counsel in the courtroom and wondered what had transpired in the past between these two individuals to make the judge biased."

That's an affidavit, Your Honor, signed under oath by a nurse that I had never met about conduct she observed on Your Honor's part during the week of May 10th, long before Your Honor held me in contempt. And I think the record should reflect, Your Honor, that on at least four separate occasions, I approached the bench and begged Your Honor—begged, Your Honor, to go into chambers so that we could discuss man to man where your hatred and bias came from and why you were taking it out on my client.

In each instance, you refused, even to the extent where now people from my office cannot even file papers with your court because we're not allowed through the security door. They have—not me—other lawyers in my office have to buzz, and your clerks come outside to receive the papers for fear that someone in my office might be in your chambers. Your Honor—

THE COURT: That's an assumption that's not true, Mr. Schutter. There have been security matters taken care of because of threats to the buildings here—in the State buildings.

SCHUTTER: You have an answer for everything, Your Honor.

THE COURT: Yes. You're making these accusations.

SCHUTTER: You're not listening.

THE COURT: I'm listening.

SCHUTTER: All you're doing is responding. All you're doing is arguing. Four times—

THE COURT: The Court is in charge of this matter. Please continue.

SCHUTTER: Four times, four times I begged Your Honor to let us go into chambers to discuss this matter man to man to find out where it was coming from.

THE COURT: What do you mean man to man? The matters are heard in the courtroom.

SCHUTTER: Thank you, Your Honor. I know that. And I also know that in every other trial I've ever had, we've had numerous off-the-record conversations in chambers. And I know that Your Honor has in trials as well. But in this case, you refused to do so and later quoted me as challenging you to fight in those instances, when all I was asking you to do was to discuss with me why in God's name you were doing this.

THE COURT: What are you talking about challenging to fight, Mr. Schutter?

SCHUTTER: You told other people that I had challenged you to fight in this case.

THE COURT: I've not said anything about it.

SCHUTTER: Fine. Thank you, Your Honor. That's a perfect example.

I'm not going to disclose the confidences of who told me. So the record reflects Your Honor's disagreement with me on it.

I obviously didn't challenge you to fight. I'm not crazy. But that's what Your Honor described it as. When, in fact, all I did was ask on the record that we have a discussion in chambers about why you were doing it. And all you said on the record was, "I'm giving you a fair trial." So I read into the record an affidavit from a witness who didn't even know

me, describing what you were doing to me and my client. And your answer is, "So what."

I'd like to get back, if I might, to the text of what I was trying to discuss. I don't understand why Your Honor, in reading Count II, went outside the record to say that I was yelling, when in fact I was not. And Your Honor even went into the record later.

And if Your Honor recalls the instant [sic] that you're talking about, Mr. O'Connor was over here with the witness standing at the witness stand. I was at counsel table. And you put on the record later that you weren't even looking at Mr. O'Connor; that you were looking straight forward—when, in fact, 20 or 15 seconds of dead silence ensued. After you said you didn't remember, you looked at Mr. O'Connor. He said he didn't remember, and the two of you locked eyes. And both of you were absolutely silent trying to figure out what to do.

Now, I stood up and pointed out something—

THE COURT: That is not true, Mr. Schutter. Let's proceed.

SCHUTTER: Well, that's why it's difficult for you to be the finder of fact. You're saying you weren't looking at Mr. O'Connor. And I'm saying that you locked eyes and the two of you were absolutely silent while directing your attention directly to each other and trying to figure out what to do. And I stood up and said something which apparently Your Honor found offensive. But it was a comment on what you were doing.

Your Honor, when I stand up and say "That question goes beyond the scope of cross—beyond the scope of redirect because it wasn't asked on cross: and you say "I don't remember", and Mr. O'Connor says "I don't remember," what's suppose to happen?

THE COURT: The Court wanted to check its notes to make sure that that's true.

SCHUTTER: But you weren't looking at your notes. You were staring at Mr.

O'Connor waiting for a solution to the problem.

THE COURT: That's what you say.

SCHUTTER: When I say that it was not going into on cross examination and you and Mr. O'Connor both say you don't remember, I'm led to believe, Your Honor, that you don't accept my word for anything—as you're making clear in this argument that I'm trying to have before the Court, a discussion that I'm trying to have before the Court.

You see, I said it wasn't covered. You and Mr. O'Connor don't remember. I may be an idiot. But in my experience, when I remember and nobody else does, you know what the judge does? I know it would have hurt to say it, but you rule for me. Because you're saying you can't say it's not and Mr. O'Connor, who's the adversary, is saying he can't say it's not. So you say, "Objection sustained". But instead of that, you stare at Mr. O'Connor, and he stares at you for 10, 15, maybe even 20 seconds. And it's as if I was not even in the courtroom.

I had made the objection. But nobody's going to rule; nobody's going to say anything. And you and Mr. O'Connor have both said you don't remember, and you're staring at each other. So I stand up and said, "My word, apparently, doesn't mean anything in this courtroom." And Your Honor held me in contempt. All I was doing was making a flat statement of fact.

I had said it was beyond the scope. You said you didn't remember; Mr. O'Connor said he didn't remember. And you absolutely refused to do anything. You didn't check your notes; you didn't take a recess; you didn't rule. You simply locked eyes with Mr. O'Connor, and that's why later, in the record, I refer to it as an Abbot and Costello, Laurel and Hardy, or Alfonse and Gaston Act because it was embarrassing.

The whole trial simply came to an end with you staring at Mr. O'Connor; Mr. O'Connor staring at you, and me being completely left out of the proceedings. And then, you have the audacity to put

on the record that you weren't looking at Mr. O'Connor, which was absolutely untrue. But I don't choose to contest the charges, Your Honor.

THE COURT: What do you mean, Mr. Duffy? Is Mr. Schutter contesting or not contesting?

DUFFY: He is exercising his right to make a statement at the sentencing hearing, Your Honor.

THE COURT: What I'm hearing is he's contesting while you say you're not contesting.

DUFFY: He's offering his statement as to the events of what he has a right to say at a sentencing hearing, Your Honor.

THE COURT: All right [sic]. Proceed, Mr. Schutter.

SCHUTTER: It's very difficult to proceed under the circumstances, Your Honor. Let me go back. You still don't understand that someone has the right to not contest even though they're not guilty? I mean, there's a proposition of law that's unacceptable to you?

THE COURT: Well, what you're arguing—

SCHUTTER: I'm telling you I am not guilty. I am not guilty. But I am choosing not to contest. And I'm trying to explain that to Your Honor. And you're back to the first 30 seconds of my elocution [sic] in a question to my lawyer. And I don't understand that.

THE COURT: Well, I don't understand your position. You're not contesting but you're arguing and you're saying you're not guilty?

SCHUTTER: You don't understand that. Are you familiar with—

THE COURT: It seems inconsistent.

SCHUTTER: Are you familiar with *Alfred [sic] vs North Carolina*, Your Honor?

THE COURT: We're not going to argue. I'm giving you a chance to have a say—

SCHUTTER: You're not. You're interrupting me to ask my lawyer what I'm doing.

In *Alfred [sic] vs North Carolina*, Your Honor, a black man was accused of rape

in North Carolina. He faced the death penalty. He told his lawyer he didn't do it. His lawyer told him, "If you go to trial in front of a white jury in North Carolina, guess what's going to happen? You're going to be executed." So Alfred said, "Gee, I'd rather plead guilty to a lesser charge, then."

So he goes into court to plead not guilty to—to plead guilty to a lesser charge; and the judge says, "Are you pleading guilty because you're guilty and for no other reason?" And he said, "No, I'm not guilty." The judge refused to let him plead. So they took him to trial and sentenced him to death. And the US Supreme Court in a famous famous famous case said, "A defendant should have the right to plead guilty, even if he's not."

Now, you don't understand that. I mean, I don't have the right to explain what happened because I pled that I chose not to contest it? And we're doing this—

THE COURT: I'm letting you speak, Mr. Schutter.

SCHUTTER: No, you're not. You interrupted me to ask my—Oh, geez. This is exactly what happened during trial, Your Honor. Exactly.

What is the purpose of baiting me this way, Your Honor?

THE COURT: I'm not baiting you, Mr. Schutter.

SCHUTTER: You're interrupting me with questions to my lawyer about what I'm doing is not baiting me?

THE COURT: I'm not baiting you.

SCHUTTER: Saying you don't understand what I'm talking about is not baiting me? That's a calm rational discussion between judge and lawyer.

May I ask why we were not allowed to speak before sentencing?

THE COURT: No, I'm not going to answer that, I'm giving you a chance now.

SCHUTTER: I would like to apologize to the Court for the conduct for which you did not cite me for contempt and for any inferences you may have drawn of con-

temptuous conduct from the instances you have charged me where with where [sic] I was not in contempt. And I plead guilty to one thing—and that is to not have the patience to do what a lawyer is apparently required to do.

And that is, as I told Your Honor, on the record; as I tried to tell Your Honor off the record, when I see my clients being cheated out of what they deserve by the conduct of a judge, whether it's directed at my clients or by me, I understand that I am suppose [sic] to simply stand at parade rest and take it. I understand that that is what is required by the law. And there were times during the trial when I did not exercise sufficient patience to simply take care of the matter on appeal.

The two incidents which I have been cited were instances where the Court asked me a direct question which indicated to me—and this is where the lack of patience comes in—indicated to me that the Court had not followed the questioning; did not know what was happening. And in the middle of a heated objection by Mr. O'Connor and a response by me, the Court did not deal with the question before it but rather chose to ask me, when I was in the middle of a heated argument, "What is the question." And I responded by telling, Your Honor, or trying to, exactly what the question was. And Your Honor cited me for yelling.

I apologize to the Court if the Court considered that I was yelling. I was in fact deeply frustrated by the fact that the Court would not rule on the argument that was going on but chose to simply ignore it by asking me what was the question. But my response was exactly what the Court was asking for, which was to tell you what the question was.

In the second count, Your Honor, when you and Mr. O'Connor had reached the point where nothing was going to proceed, where nothing was happening, where the trial had reached a dead end, and where I was being simply left out of

it completely as Your Honor from the bench stared directly down to your left to Mr. O'Connor and the two of you were in locked eye, I felt wrongly; that I should say something about this obvious disregard and refusal to rule on my objection.

I guess—and I'll take the "I guess" out of it—I should not have said it. But I'll be honest with Your Honor. I don't know what would have happened. You weren't checking your notes. You weren't asking any questions. You weren't saying anything. There was an objection pending on which you were not ruling.

Now, obviously, I do not have sufficient patience. And I'm only 52 years old. What I intended to tell the Court, before I got side-tracked into the further discussions that the Court obviously finds offensive, is that I will certainly attempt to obtain the sufficient amount of patience to be able to simply—

You see, when I started out with John Flynn in Phoenix, Your Honor, in 1965, Mr. Flynn was nationally famous. He'd handled over a hundred and thirty First Degree Murder Charges in the State of Arizona. He was the lawyer for Ernest Miranda in Miranda vs Arizona. And I tried to pattern my career after him completely, except for one thing, Your Honor. Every time a judge absolutely screwed over Mr. Flynn or his client, Johnny, who'd been a former Marine, would lock his arms behind him in parade rest and simply let the judge tap dance on his client's head hoping to win on appeal. And I guess I overreacted to that, your Honor, because I swore then that I would never let it happen.

Now, it's been 18 years—18 years since I've been held in contempt by anyone. And the only two times I was ever held in contempt, Your Honor, one was withdrawn by the judge and the other was reversed by the Hawaii Supreme Court. I have never been successfully or permanently held in contempt of any court, ever, in my 28 years as a lawyer, 25 of them here in Hawaii. Yet, I am choos-

ing not to contest these charges before Your Honor and trying to tell you from the heart that many of the things I said, I shouldn't have said.

And to give Your Honor the benefit of the doubt, I will say that it is probably true that Your Honor did not have a personal animus against me and probably did not have a personal animus against my client. But I would hope that Your Honor, underneath the black robe, has enough heart to understand that when casual observers in the courtroom, whom I've never met before, are coming up to me and asking me "Why does the judge hate you so," it begins to bother me.

And at one point, when you ruled against my position 17 times in a row, where I am egotistical enough on to pride myself on having some knowledge of the rules of evidence—and I've never had that happen to me in 28 years of practice—it did, unfortunately—and I apologize for this—cause me, perhaps, to overreact and feel that Your Honor definitely did have a bias. And if Your Honor says you didn't, I have to accept that because I have no way of knowing.

But without offending Your Honor, I'm trying to get the message across that the record clearly reflects and everybody in the courtroom clearly reflected that Your Honor did have it in for me. And I should not have reacted the way I did, but there was provocation. And I'd like to remind Your Honor that both of these contempts are late in the second week of trial after all of the other incredible things that happened in that trial happened.

For example, my expert witnesses, the first witness in the trial, when we go to the bench, he's required to go out through that door and close the door. Their expert witnesses on the stand, he's not only not required to go out the door, he's standing next to the jury box. And I put on the record, Your Honor—I put on the record that he was making faces at the jury; that he was giving facial expressions and the rest of it. And I

asked Your Honor to take a recess. Let me put those witnesses from the gallery on the stand. And what did Your Honor do? You said "I didn't see it, and you're denied to put any witnesses on." And even when I tried to put in our offer of proof later, you didn't even want to hear it. And later, when holding me in contempt, Your Honor, you put on the record that after I objected, you had made their witness go outside the room, too. And that wasn't true. Your Honor.

You had specifically denied me that relief. I came to the bench and begged you, "Why can't you treat their witnesses like ours." And you said, "I won't. My bailiff is on military leave, and their witness will not leave the room." And I put on the record, Your Honor, that what happened at that point was Mr. O'Connor said, "I'll take care of it." But ten pages later in the transcript, Your Honor is bragging that you're the one who ordered their witness out of the room.

Now, I'm sorry, Your Honor. I guess it has to do with what Mr. Duffy was talking about, and I'm apologizing for it. But when Alice in Wonderland statements like that are made to the detriment of my client, I ask Your Honor to put yourself in my position. If a judge ever did that to you, I don't—no, I guess I have to assume that Your Honor would simply lock your hands in parade rest and take it. But I don't believe it. I have to assume it, I guess. And so, I do apologize to the Court. And I know that in some of my other comments, I went too far.

But I don't understand why Your Honor wouldn't listen; why Your Honor, when I asked you to explain rulings, wouldn't explain; why when I asked Your Honor that we go in chambers to talk this over, not only absolutely refused but then misquoted me later; why my witnesses had to be locked out of the room, their witnesses could come in and make faces at the jury; and Your Honor not only wouldn't do anything about it, wouldn't even let me put on witnesses to prove it.

I guess, this is just a long winded way of saying, Your Honor, I was extremely frustrated. We didn't get a fair trial. And I guess—I've got to say, I assume you tried. But for some reason, your animosity toward me or whatever—and I remember during the trial, long before I was held in contempt, turning to my associate and saying, "When did this start? Why?" And we used to discuss it back at the office by the hour.

Because in the pretrial motions and the Motions in Limine and in the picking of the jury, Your Honor went out of his way, I thought, to be really fair. And on the first full day of trial, after our witness Doctor Steinberg testified and I called Doctor Tashima as my next witness the next morning, there was a total 180 percent turn of Your Honor's attitude, of your tone of voice, of your rulings, of everything.

Now, I'm a big boy. I can take that. The Supreme Court is there. But when you got to the point of ridiculing me before the jury when Mr. O'Connor had a witness write something on the blackboard and then had him write it on a piece of paper and then offered that piece of paper in evidence and I took the piece of paper and I said to your Honor as approaching the bench, "Your Honor, this is illegible. I can't read it. If you can read it, I guess I have no objection.["] And I handed it to Your Honor at the bench.

And what did Your Honor do? You said on the record, "I can read it." And you proceeded to read it out loud to the jury, going out of your way to embarrass me; to make me look like a fool; to make it clear to the jury that you had a definite strong opinion in the case. And, you know, after saying on the record "I can read it" and reading it, you go to the third to last line and you had to admit that it was illegible; that you couldn't make it out.

You know, Judge, try to have a little empathy. Put yourself in my shoes. You walk up to the bench and ask the judge if something is legible or not, can you read it. And the judge begins to read it out loud to the jury, saying I can read it and yet let [sic] less than 45 seconds later has to admit "It's illegible, I can't read it."

I have to learn more patience, Your Honor. But absolutely, Your Honor, I guess the last word I can leave you with is I'd rather be charged with contempt for overzealously representing my clients than for taking that kind of judicial prejudice lying down. And it's a difficult decision to make. And given the affidavit of the lady that I didn't even know in the audience, to tell me that you won't disqualify yourself; you'll be the finder of the facts; you'll be the witness; you'll determine whether you're bias [sic]; and you'll determine what happened leaves completely out of the question any possibility that Your Honor is human.

Now, I'm apologizing for what I did. I'm telling you I'm sorry. And I'm telling you I did something wrong that I shouldn't have done, and I said some things I shouldn't have said. But the things I'm charged with, given a fair trial before a neutral fact finder, I'm not guilty of those, Your Honor.

Thank you.

After Schutter had his opportunity to address the court, Duffy again requested that the court consider suspending a substantial portion of the jail time. Judge Soong stated that he would take the matter under advisement and stayed the mittimus.

On June 24, 1993, the court entered its findings and judgment on the charges. The next day, on June 25, 1993, the court denied Schutter's oral motion for reconsideration of the sentence.

On July 14, 1993, the day mittimus was to be issued, Judge Soong held hearings on Schutter's motions: (1) to disqualify him and vacate the contempt convictions and sentences; (2) to withdraw the no contest pleas; (3) for re-sentencing because of a denial of Schutter's right to pre-sentence allocution; (4) for bail pending appellate review; and (5) for a stay of mittimus. Schutter was represented by attorney Brook Hart (Hart). Hart

asked the court to consider the fact that Schutter and Duffy believed a plea agreement was reached informally between Judge Soong and Duffy.[4] Hart argued that because Schutter believed an agreement was in place, and the court did not allow Schutter to make a statement prior to sentencing, "caused Mr. Schutter to lose his composure to the point where instead of a full and complete apology, he also used the occasion to reflect on his negative feelings about the matter."

The court denied the motions to disqualify it, to withdraw the no contest pleas, and for re-sentencing. Judge Soong did, however, grant a zero bail amount, and mittimus was stayed until further notice.

## II. DISCUSSION

### A. Motion To Disqualify

■ ▪ In his petition, Schutter alleges several errors below. Initially, we address Schutter's argument that Judge Soong should have disqualified himself. The State counters that Schutter waived his right to seek a disqualification of Judge Soong, in that Schutter did not file a motion to disqualify until July 14, 1993.

HRS § 601–7(b) (1985) provides in part: **Disqualification of judge; relationship, pecuniary interest, previous judgment, bias or prejudice.**

. . . .

(b) Whenever a party to any suit, action, or proceeding, civil or criminal, makes and files an affidavit that the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice either against the party or in favor of any opposite party to the suit, the judge shall be disqualified from proceeding therein. Every such affidavit shall state the facts and the reasons for the belief that bias or prejudice exists and shall be filed be-

fore the trial or hearing of the action or proceeding, or good cause shall be shown for the failure to file it within such time. . . .

According to the plain language of the statute, Schutter's affidavit should have been filed before the contempt proceedings. However, because Judge Soong ruled on the motion to disqualify himself, Schutter's failure to file a timely motion will not be deemed a waiver of his right to seek a disqualification, and we may review the decision of the lower court. Cf. State v. Przeradski, 5 Haw.App. 29, 31–32, 677 P.2d 471, 474–475 (1984) (if an appellant fails to move to suppress evidence before trial, but the judge rules on the motion to suppress during trial, the appellant has not waived his right to object and an appellate court may review the lower court decision).

■ Schutter contends that his convictions and sentences should be vacated because Judge Soong failed to disqualify himself from presiding over the contempt proceedings. The State counters that Judge Soong was not required to disqualify himself. Both parties rely on Evans v. Takao, 74 Haw. 267, 842 P.2d 255 (1992).

In Evans, Judge Takao found petitioner Christopher Evans (Evans) in contempt of court during trial. However, at the request of Evans, Judge Takao withdrew the sentence and postponed further hearings until the conclusion of trial. Id. at 274–275, 842 P.2d at 259. At the conclusion of the trial, Judge Takao held a hearing on the contempt charge. After Judge Takao read the charges against Evans, his counsel replied that "we understand the charge." Id. at 275–276, 842 P.2d at 259–260.

At the request of Evans, Takao granted another continuance. Evans, thereafter, moved for writs of prohibition and mandamus in this court, prohibiting Judge Takao from pursuing a criminal contempt of court charge

---

4. Hart argued that Duffy and Schutter understood that Schutter was to make a "full and complete and appropriate apology" and the court would sentence Schutter to twelve days of incarceration, but would suspend ten days. Duffy's understanding was later confirmed by his affidavit filed in this court.

Judge Soong responded, during the hearing, that "there was no agreement with respect to time. There was talk in the neighborhood of two to four days, depending upon Mr. Schutter's extent of apology."

against Evans, or in the alternative, to transfer the proceedings to another judge. *Id.* at 278, 842 P.2d at 261.

Evans argued, *inter alia,* that the contempt proceedings should not be conducted before Judge Takao. *Id.* at 287, 842 P.2d at 264. We held that where the contempt is "committed in the immediate view and presence of the court[ ] or under such circumstances that the court has knowledge of all facts constituting the offense[,]" the determination of whether the contempt proceedings may be had before the accuser depends on the nature of the alleged misconduct and the character of the judge's response to the misconduct. *Id.* at 290–91, 842 P.2d at 265–66, (citing *State v. Brown,* 70 Haw. 459, 467, 776 P.2d 1182, 1188 (1989); *Taylor v. Hayes,* 418 U.S. 488, 503 n. 10, 94 S.Ct. 2697, 2705–06 n. 10, 41 L.Ed.2d 897 (1974)).

We further stated that:

[w]here the record reflects "marked personal feelings ... on both sides" inflicting lingering "personal stings" on the judge (i.e., where the case conveys an apparent "flavor of animosity on the part of the judge against counsel," ... such that the citing judge manifestly loses his or her capacity to "perform judicial duties without bias or prejudice," ...) another judge "should [be] substituted for the purpose of finally disposing of the charges of [summary] contempt[.]" On the other hand, where the judge: (1) responds to the alleged direct summary criminal contempt " 'dispassionately and with a decorum befitting a judicial proceeding' "; (2) affords the accused " 'an opportunity to be heard in his own behalf' "; and (3) gives the alleged contemnor " 'reasonable notice of the specific charges when conviction and punishment for trial conduct are delayed until after trial,' " due process does not mandate a substitution.

*Id.* at 291–292, 842 P.2d at 266 (citations omitted).

Based on the above, we concluded that the record did not reflect a "personal sting" upon Judge Takao such that Judge Takao lost his capacity to perform his duties without bias or prejudice. Moreover, the record was devoid of any evidence of animosity by Judge Takao

against Evans. Specifically, Judge Takao provided Evans with reasonable notice of the charges against him, as well as an opportunity to be heard. Judge Takao also withdrew his judgment and sentence, twice granted Evans' requests for a continuance and "responded to Evans' allegedly contemptuous conduct dispassionately and with a decorum befitting a judicial proceeding." *Id.* at 293, 842 P.2d at 267. Thus, we held that due process did not require that the proceedings be held before someone other than Judge Takao. . *Id.*

■ The instant case, however, is distinguishable from *Evans.* As stated *supra,* Evans sought a hearing before a judge other than Judge Takao, but he had not filed a HRS § 601–7(b) affidavit as was done by Schutter. Where an affidavit is timely filed pursuant to HRS § 601–7(b), we must accept the facts alleged in the affidavit as true, and our only function is to determine whether the facts sufficiently establish a personal bias and prejudice. *State v. Mata,* 71 Haw. 319, 325, 789 P.2d 1122, 1126 (1990).

■ However, while the essential documentation of Schutter's motion to disqualify was his affidavit, we may consider the entire record when the affidavit to disqualify is based upon matters of record. *Peters v. Jamieson,* 48 Haw. 247, 257, 397 P.2d 575, 582 (1964). Moreover,

[a]ny motion to disqualify based on matters of record must find its support in the record.... [Section 601–7(b), HRS] was never intended to permit a party to file an affidavit setting out as incontrovertible facts matters which appear from the record.... Hence, in the present case, whether grounds of disqualification have been established must be gleaned from the record.

*Id.* (citations omitted). Thus, because the motion to disqualify is based on matters of record, we review the entire record and the affidavit to determine whether Schutter has established facts which show a "personal" bias against him. Furthermore, in order to establish a "personal" bias, Schutter must be able to show "marked personal feelings ... on both sides inflicting lingering personal

stings" on Judge Soong. We conclude that Schutter has not met this burden.

Throughout the *Aga* trial, Schutter continually challenged the court and accused Judge Soong of being biased. However, the record reflects that Judge Soong did not react in anger, warned Schutter several times that his behavior was improper, and only cited Schutter with contempt when the misconduct was in the jury's presence. Judge Soong also gave Schutter reasonable notice of the charges and allowed Schutter to respond to each of the charges. Moreover, Judge Soong twice granted Schutter's request for a continuance, allowing Schutter to obtain counsel. Judge Soong also released Schutter on his own recognizance and did not require Schutter to post bail. Finally, Judge Soong stayed the mittimus in order for Schutter to resolve a matter he was trying before the federal courts and to petition this court for special proceedings. Thus, we conclude that at all times, Judge Soong conducted himself with the utmost judicial decorum and impartiality, despite Schutter's continuous attacks on the court. We therefore hold that Judge Soong did not err when he denied Schutter's disqualification motion.

### B. *Procedural Due Process Rights*

Schutter was charged with direct summary criminal contempt, a situation that arises when the alleged offense is committed in the immediate view and presence of the court or under circumstances where the court has knowledge of all of the facts constituting the alleged offense. *Evans,* 74 Haw. at 279, 842 P.2d at 265 (citations omitted). The court issued the charges pursuant to HRS § 710–1077 (1985 & Supp.1992), which provides in part:

> **Criminal contempt of court.** (1) A person commits the offense of criminal contempt of court if:
>
> > (a) The person recklessly engages in disorderly or contemptuous behavior, committed during the sitting of a court in its immediate view and presence, and directly tending to interrupt its proceedings or impair the respect due to its authority;

> . . . .
>
> (3) The court may treat the commission of an offense under subsection (1) as a petty misdemeanor, in which case:
>
> > (a) If the offense was committed in the immediate view and presence of the court, or under such circumstances that the court has knowledge of all of the facts constituting the offense, the court may order summary conviction and disposition;

> . . . .
>
> (5) Whenever any person is convicted of criminal contempt of court or sentenced therefor, the particular circumstances of the offense shall be fully set forth in the judgment and in the order or warrant of commitment.... A judgment, sentence, or commitment under subsection (3)(a) shall not be subject to review by appeal, but shall be subject to review in an appropriate proceeding for an extraordinary writ or in a special proceeding for review.

> All other judgments, sentences, or commitments for criminal contempt of court shall be subject to review by appeal, in a proceeding for an appropriate extraordinary writ, or in a special proceeding for review.

Thus, according to the statute:

> [i]n the face of "an open, serious threat to orderly procedure in the case" or to "the orderly administration of justice," HRS §§ 710–1077(1)(a) and (3)(a) authorize a court to impose "instant and summary punishment" and to dispense with "'due and deliberate procedures....'" *In re Nam,* 65 Haw. 119, 125, 127–28, 648 P.2d 1101, 1105–07 (1982) (quoting *Harris* [*v. U.S.*], 382 U.S. [162] at 165, 86 S.Ct. [352] at 354 [15 L.Ed.2d 240 (1965) ] ).

*Evans,* 74 Haw. at 282–83, 842 P.2d at 262.

In cases like the present case, where conviction and sentencing is postponed until the conclusion of the trial, "the alleged contemnor 'should have reasonable notice of the specific charges and an opportunity to be heard in his own behalf.'" *Id.* at 283, 842

P.2d at 263 (citations omitted). The only procedural issues, then, are whether Schutter received adequate and particularized notice of the charges against him and was given the opportunity to be heard in his own behalf.

### 1. *Adequate notice*

When Judge Soong initially cited Schutter for contempt, he both described the conduct that he believed was contemptuous, and cited the statute under which Schutter was being charged. Thereafter, at the contempt hearing, Judge Soong once again detailed the specific charges and the statute. Pursuant to *Evans,* this is sufficient to establish reasonable and adequate notice.

Schutter, however, makes two arguments that he was not given adequate notice. His first argument is that Judge Soong failed to make an on-the-record determination, by personally questioning Schutter, as to whether Schutter understood the charges. This argument is without merit.

During the *Aga* trial, after reciting very specific charges, Judge Soong inquired as to whether ·Schutter understood the charges. Schutter responded that he did not. We, however, find that Schutter's response was argumentative and not an indication that he did not understand the charges.

At the contempt hearings, Judge Soong made a second inquiry by asking Duffy whether or not he understood the charges. While Duffy did not specifically state that he understood the charges, he did state that they (he and Schutter) did not choose to contest either of the charges. As stated previously by the Intermediate Court of Appeals (ICA), when a defendant is heard through counsel, he has been afforded a fair opportunity to be heard prior to sentencing. *State v. Medeiros,* 8 Haw.App. 39, 47, 791 P.2d 730, 735, *cert. denied,* 71 Haw. 669, 833 P.2d 901 (1990) (whether the defendant must be questioned personally before sentencing, and whether he must speak personally, or whether his counsel may speak for him, depends on whether the statute concerned specifically requires that the defendant answer personally). Thus, because Judge Soong was very specific when citing Schutter, and asked Duffy whether Schutter understood the charges, Schutter has not established a lack of adequate notice.

Schutter's next argument pertains to his second citation for contempt. Schutter claims he was not afforded reasonable notice of the charges because at the contempt proceedings Judge Soong stated that Schutter was "yelling" when Schutter implied that Judge Soong was working with O'Connor. This argument is also without merit because the record shows that when Duffy pointed out that the record did not reflect any "yelling," Judge Soong limited the charge to the implication that the court was favoring the defense.

Accordingly, Schutter was afforded reasonable and adequate notice of the charges.

### 2. *Opportunity to be heard*

Although the opportunity to be heard was not an issue in *Evans,* in a footnote we cited the United States Supreme Court and stated that an opportunity to be heard does not mean:

> that a full-scale trial is appropriate. Usually, the events have occurred before the judge's own eyes, and a reporter's transcript is available. But the contemnor might at least urge, for example, that the behavior at issue was not contempt but the acceptable conduct of an attorney representing his client; or, he might present matters in mitigation or otherwise attempt to make amends with the court.

*Evans,* 74 Haw. at 283 n. 4, 842 P.2d at 263 n. 4 (citing *Taylor v. Hayes,* 418 U.S. 488, 499, 94 S.Ct. 2697, 2703, 41 L.Ed.2d 897 (1974)). The footnote further noted that the United States Supreme Court has also acknowledged the recommendation of the American Bar Association Advisory Committee that " '[b]efore imposing any punishment for criminal contempt, the judge should give the offender notice of the charges and at least a summary opportunity to adduce evidence or argument relevant to guilt or punishment.' " *Id.* (citing *Taylor,* 418 U.S. at 499 n. 8, 94 S.Ct. at 2703–04 n. 8).

In the instant case, Schutter was afforded an opportunity to be heard immediately fol-

lowing his citations during trial. He was not, however, allowed to speak prior to sentencing.[5] Clearly, had Judge Soong immediately sentenced Schutter following Schutter's allocution during trial, the conviction and sentences would be affirmed absent an abuse of discretion. However, in the instant case, Judge Soong postponed conviction and sentencing until the conclusion of trial. Thus, pursuant to *Evans* and *Taylor*, Schutter had the right to pre-sentence allocution at the proceedings held after trial.

The State contends that Schutter was not denied the opportunity to be heard because Schutter was heard immediately following the citations and later, following a preliminary announcement of sentencing. Specifically, the State argues that the sentence was not actually imposed at the contempt hearings because the court took the motion for a reduction in the sentence under advisement.

Although not cited by the State, there is case law that supports the State's argument. In *State v. Medeiros*, 8 Haw.App. 39, 791 P.2d 730, *cert. denied*, 71 Haw. 669, 833 P.2d 901 (1990), the defendant appealed her conviction for theft in the fourth degree, a petty misdemeanor. After a bench trial, the trial court found her guilty on November 30, 1988 and immediately sentenced her to five days in jail. The court, however, stayed the mittimus pending the disposition of a co-defendant's case and the receipt of a pre-sentence report which the court ordered. *Id.* at 42, 791 P.2d at 733. Later, on February 22, 1989, the court "again considered" the defendant's sentence, along with a motion for reconsideration of the sentence. *Id.* at 46, 791 P.2d at 735.

On appeal, the defendant argued, *inter alia*, that she was not afforded an opportunity to be heard prior to her sentencing hearing on November 30, 1988, or at the hearing to reconsider on February 22, 1989. *Id.* at 47, 791 P.2d at 735. The ICA stated that:

> although the court erred when it originally imposed sentence on [defendant] on November 30, 1988, the law was satisfied at the February 22, 1989 hearing when defense counsel outlined for the court that [defendant] had three children; was employed as a receptionist with ambitions of becoming a cosmetologist; was unemployed at the time of the incident; that she was sorry for the crime; that she was willing to pay a fine or do community service; that she would lose her job if incarcerated; and that she did not have an extensive criminal history, having only a "prior theft and a Contempt of Court."

*Id.* at 48, 791 P.2d at 736.

We, however, find *Medeiros* to be in error. Once a defendant is denied the opportunity to be heard, this denial of due process cannot be corrected later at a motion for reconsideration. We, therefore, overrule *Medeiros* insofar as it holds that the denial of the right to pre-sentence allocution may be cured later at a hearing to reconsider the sentence. Accordingly, we hold that Schutter was denied his right to pre-sentence allocution, and therefore, this matter should be remanded for re-sentencing before a new sentencing judge.[6]

### C. The Contemptuous Behavior

■ Finally, Schutter contends that he was merely zealously representing his client. While every counsel has the right to pursue

5. There is some evidence in the record that an agreement was reached between Judge Soong and Duffy regarding the sentencing. The substance of the agreement seems to indicate that if Schutter gave an appropriate apology, Judge Soong would sentence Schutter to twelve days, but would suspend eight to ten days depending on the extent of the apology.

With respect to the agreement, there appears to have been a misunderstanding between the parties. It appears that Judge Soong understood that he would sentence Schutter and then hear the extent of Schutter's apology, while Schutter understood that he would apologize prior to the sentencing. However, because we conclude that

Schutter should have been given the opportunity to be heard prior to sentencing, we need not discuss this issue.

6. It should be noted that we are remanding the re-sentencing to a new sentencing judge because remanding the matter to Judge Soong would be an inadequate remedy, as Judge Soong has previously determined the appropriate length of the sentence. This, however, is not an indication that Judge Soong in any way conducted himself in an inappropriate manner. As we stated *supra*, we find that Judge Soong conducted himself with the utmost judicial decorum and impartiality.

every claim, if a ruling is unfavorable, "it is not counsel's right to resist it or to insult the judge—his right is only respectfully to preserve his point for appeal." *Evans,* 74 Haw. at 291 n. 9, 842 P.2d at 266 n. 9, (citing *In re Nam,* 65 Haw. 119, 127, 648 P.2d 1101, 1106 (1982)). Clearly, Schutter went beyond his right of zealous representation when he yelled at the court and implied that the court was "working with" defense counsel.

Schutter, nevertheless, attempts to argue that his conduct was not contemptuous, and that he is "absolutely innocent as the driven snow." We disagree.

Schutter's behavior was reprehensible. We cannot fathom any situation that would warrant counsel yelling at the court or blatantly stating, in the presence of the jury, that the court is working with opposing counsel. These are simply contemptuous acts that we find to be inexcusable.

This court in *In re Nam,* 65 Haw. at 128, 648 P.2d at 1107, took the opportunity to call Disciplinary Rule 7–106(C)(6) to the attention of the bar:

> In appearing in his professional capacity before a tribunal, a lawyer shall not:
>
> . . . .
>
> (6) Engage in undignified or discourteous conduct which is degrading to a tribunal.

The reason for this rule is cogently stated in the first two sentences of Ethical Consideration EC 7–36, to wit:

> Judicial hearings ought to be conducted through dignified and orderly procedures designed to protect the rights of all parties. Although a lawyer has the duty to represent his client zealously, he should not engage in any conduct that offends the dignity and decorum of proceedings.

*In re Nam,* 65 Haw. at 128, 648 P.2d at 1107.

Once again, we refuse to "equate an attorney's contempt for the court with courage or his insults with independence and we will protect the orderly processes of justice." *Id.* at 128, 648 P.2d at 1107.

## III. CONCLUSION

Accordingly, we vacate the sentence imposed against Schutter and remand for re-sentencing before a new sentencing judge.