965 P.2d 793

**April J.A. HO, Plaintiff–Appellant,**

**v.**

**Jeremy LEFTWICH, Defendant–Appellee,**

**and**

**John Does 1–10, Jane Does 1–10, Doe Partnerships 1–10, Doe Corporations 1–10, Roe Non–profit Organizations 1–10, Roe Governmental Entities 1–10, Defendants**

No. 20398.

Supreme Court of Hawai'i.

Oct. 21, 1998.

As Amended Oct. 23, 1998.

Arnold T. Phillips and Jacob Merrill, On the Briefs, Honolulu, for Plaintiff-Appellant.

Mark T. Ichiyama, On the Briefs, Honolulu, for Defendant-Appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Justice.

The plaintiff-appellant April Ho appeals from (1) the judgment entered after the circuit court granted the motion of the defendant-appellee Jeremy Leftwich for a directed verdict and (2) the circuit court's order denying Ho's motion for a new trial. On appeal, Ho contends that the circuit court erred (1) in refusing to accept the medical-rehabilitative expense threshold established in Hawai'i Revised Statutes (HRS) § 431:10C–306(b)(2) (1993)[1] as a jurisdictional requirement that must be challenged before trial or be deemed waived and (2) in ruling that the plaintiff had not presented sufficient evidence to establish that she had met the medical-rehabilitative expense threshold. Ho's points of error on appeal are without merit. Accordingly, we affirm the judgment and order appealed from.

## I. FACTUAL BACKGROUND

On May 28, 1994, at about 5:15 p.m., Ho was driving her 1991 Honda Civic on Salt Lake Boulevard when it was struck from behind by another vehicle driven by Leftwich. As a result of the impact, Ho's vehicle was pushed into the rear of the vehicle in front of it. The chain reaction continued until a total of five vehicles were involved in the collision. When the police arrived, they directed the drivers of all of the vehicles to proceed to a nearby First Hawaiian Bank parking lot. When Ho was asked by police officers at the scene if she was injured and needed an ambulance, she responded, "No."

Upon arising the next morning, however, Ho felt "strain pulling in [her] lower back and neck and shoulder area." Accordingly, she was taken to the Queen's Medical Center

---

1. HRS § 431:10C–306 provides in pertinent part:

   **Abolition of tort liability.** (a) Except as provided in subsection (b), this article abolishes tort liability of the following persons with respect to accidental harm arising from motor vehicle accidents occurring in this State:

   (1) Owner, operator or user of an insured motor vehicle; or

   (2) Operator or user of an uninsured motor vehicle who operates or uses such vehicle without reason to believe it to be an uninsured motor vehicle.

   (b) Tort liability is not abolished as to the following persons, their personal representatives, or their legal guardians in the following circumstances:

   . . . .

   (2) Injury occurs to such person in a motor vehicle accident in which the amount paid or accrued exceeds the medical-rehabilitative limit established in section 431:10C–308 for expenses provided in section 431:10C–103(10)(A) and (B); provided that the expenses paid shall be presumed to be reasonable and necessary in establishing the medical-rehabilitative limit[.]

   HRS § 431:10C–308 (1993) provides in pertinent part that "[t]he medical-rehabilitative limit . . . shall be $10,000."

   The expenses enumerated in HRS § 431:10C–103(10)(A) and (B) (1993) include:

   (i) All appropriate and reasonable expenses necessarily incurred for medical, hospital, surgical, professional, nursing, dental, optometric, ambulance, prosthetic services, products and accommodations furnished, and x-ray. The foregoing expenses may include any nonmedical remedial care and treatment rendered in accordance with the teachings, faith, or belief of any group which depends for healing upon spiritual means through prayer.

   (ii) All appropriate and reasonable expenses necessarily incurred for psychiatric, physical, and occupational therapy and rehabilitation[.]

Emergency Room by her boyfriend. After being examined by a doctor there, Ho was given medication for her discomfort, told to apply ice to the painful area every four hours for forty-eight hours, and directed to consult with a Dr. Miller if her condition did not improve. Ho testified that, while she did complete the medication as ordered, she did not continue the ice applications past the day of her emergency room visit and never contacted Dr. Miller.

About five or six days after her emergency room visit, on the advice of an acquaintance, Ho decided to consult with a chiropractor. She selected Gina Whest, D.C., from the yellow pages. Her first visit with Dr. Whest occurred on June 2, 1994. Ho's treatment by Dr. Whest continued through June and July. During that period, she continued attending classes during both summer sessions at the University of Hawai'i and earned "A" or "B" grades in all of the courses she took. Ho testified that, although she had informed Dr. Whest that she was an avid dancer, Dr. Whest never instructed her to stop dancing because of her injury. Accordingly, when fall classes began at the University, Ho enrolled in eighteen credit hours of classes, including a jazz dance class that met twice weekly for one hour and fifteen minutes.

Dr. Whest, however, testified that she was not apprised of the fact that Ho had resumed dancing while being treated and, because Ho "want[ed] to do the dancing and [the doctor] wanted to be sure there wouldn't be any relapse," referred Ho to Aloha Diagnostic for testing in September to evaluate whether she had sufficiently recovered to start dancing again. On September 7, 1994, Ho began a course of physical therapy, which Dr. Whest had prescribed as a "way to ease [Ho] back into dance."

At trial, Ho introduced videotapes of dance performances in which she participated during the fall of 1994. One was filmed the weekend of September 10 and 11, 1994, immediately after she had begun her physical therapy regimen. Although Ho testified at trial that she had experienced pain during the performance, the records of her physical therapy did not corroborate her claim. On cross-examination she testified:

Q. Now, when you performed at that benefit, you stated to Mr. Phillips that you experienced pain during that performance.

Did you go to the physical therapy people the Monday right after the performance?

A. Well, wait. What date?

Q. Well, we know that the performance took place on a weekend and the weekend is Saturday and Sunday is 10th and 11th?

A. I would say yes because I had a regular scheduled physical therapy.

Q. You went on Monday the 12th, that's on Exhibit O isn't it? Second page of Exhibit O shows a visit on September 12, that would be the first Monday after that week he said?

A. Yes.

Q. Did you ever tell, do you recollect ever telling the physical therapist there that you hurt your back performing at this benefit?

A. No, I would tell him what I do, though, over the weekend.

Q. Do you remember what you told the therapist on Monday, September 12, what was bothering you that day?

A. No, I don't remember what I told him on that day.

Q. Please take a look at what has been marked as Defendant's Exhibit O, the entry for September 12, and see if that refreshed your recollection as to what you told the physical therapist?

A. Patient feels fine today but patient, back hurt at school today while carrying books.

Q. What the therapist wrote down, was this accurate as to what you told him?

A. Yes.

Q. You told the therapist that that Monday you hurt your back at school from carrying books?

A. No, I didn't hurt it because I was carrying books, I said the back hurt today while carrying her [sic] books.

Q. Did you ever tell the therapist that day that you hurt your back from performing in a benefit dance concert?

A. No, not those words specifically.

Q. Did you use the word "dance" at all?

A. Yes.

Q. Did you say that you were dancing and you hurt your back that day on the 12th?

A. I did say I was dancing. I didn't say I was dancing and hurt my back.

Q. On Monday the 12th is it fair to say that whatever pain you suffered from that performance wasn't bothering you anymore?

A. I don't remember.

At the end of October 1994, Ho also reported a seven-hour dance rehearsal/performance to the physical therapist. Like Dr. Whest, Ho's physical therapist never advised her to stop dancing, even after she suffered a knee injury during a dance class.

Ho testified that her expenses related to the May 28, 1994 collision included: $340.00 for the Queen's Hospital Emergency Room; $6200.00 for Dr. Whest; $4100.00 for Pacific Rehabilitation Services; $1100.00 for Aloha Diagnostics; and $1922.00 in lost wages. On March 29, 1995, Ho commenced the present lawsuit against Leftwich, alleging that, as a result of Leftwich's negligence in causing the accident, she had "suffered serious physical, emotional and economic injuries including but not limited to severe pain and suffering, emotional distress, [and] accrued or paid medical/rehabilitation expenses exceeding $10,000...." [2] In addition to responding to the various allegations of the complaint, Leftwich's responsive pleading asserted that he "intend[ed] to rely on the defense of failure to meet the no-fault threshold or otherwise qualify to file suit under the no-fault law." This matter proceeded through the Court Annexed Arbitration Program, and an arbitration award was entered on January 31, 1995. On January 26, 1996, Leftwich filed a notice of appeal and requested a trial *de novo*.

At the close of Ho's case, Leftwich moved for a directed verdict:

One of the prima facie elements of a motor vehicle tort case is that medical bills which were reasonably and necessarily incurred as a result of a motor [ ] vehicle tort accident exceed tort threshold, which I believe in this case is $10,000.

From my review of the testimony and records of this case to date, no witness has ever testified to any of the medical bills or amounts claimed for medical recovery was subsequently and necessarily related to an automobile accident, therefore prima facie element of plaintiff's case has failed to be proven at the completion of plaintiff's case and as a result directed verdict is in order.

The circuit court took the motion under advisement and invited both parties to submit written memoranda.

In support of his motion, Leftwich argued that HRS §§ 431:10C–103(10)(A) and (B) limit the expenses that may be used to satisfy the statutory threshold to those "appropriate and reasonable expenses necessarily incurred" as a result of a motor vehicle accident. Relying on *Parker v. Nakaoka,* 68 Haw. 557, 722 P.2d 1028, *reconsideration denied,* 68 Haw. 688 (1986), Leftwich asserted that (1) a "plaintiff has the burden of proving that his or her claim is one that exceeds the general abolition of tort liability" and (2) "[a] trial judge may determine, as a matter of law, whether a plaintiff has met a threshold and may do so when the evidence is so clear that reasonable minds could only come to one conclusion." Leftwich argued that Ho had not presented any evidence that the expenses that she claimed were reasonable or necessarily related to the injuries that she sustained in the collision with Leftwich. Accordingly, Leftwich contended, she had failed to carry her burden of establishing that her expenses met the threshold established by HRS § 431:10C–306, and, therefore, he was entitled to a directed verdict.

Ho responded that the threshold requirement of HRS § 431:10C–306 was similar to the "amount in controversy" requirement of federal diversity jurisdiction that is met if the plaintiff makes a "bona fide" allegation that his claim meets the required limit. Ho asserted that she had met this burden

---

**2.** The present lawsuit was filed on Ho's behalf by William Elkner, who withdrew from her representation on October, 14, 1994, the day before trial commenced. Interestingly, Mr. Elkner is Dr. Whest's son-in-law.

through her own testimony. Therefore, according to Ho, the burden had shifted to Leftwich to allege "with sufficient particularity facts indicating that it is ... a legal certainty that [the] claim involves less than [the] jurisdictional amount." In her memorandum, Ho did not address the question whether the charges about which she had testified were reasonable and necessarily related to the injuries she incurred in the accident with Leftwich.

On October 21, 1996, the circuit court ruled orally on Leftwich's motion as follows:

[The] Court has reviewed not only [the] written submission, I have gone over the testimony by plaintiff and Dr. W[h]est in particular, and I have referred to some of the exhibits. And the Court is ready to rule on the matter....

All right. I looked at Exhibit F, and in Exhibit F which is Queen's Medical Center's report, the plaintiff signed on May 29, 1994, at 9:30 a.m., an authorization for admission and treatment.

And with regard to payment, 2 A says with regard to payment in full on discharge quote.

"I understand that I will be expected to pay my hospital bill for materials and services provided to me by the hospital in full when I am discharged from the hospital, unless I make other arrangements with hospital's fiscal services department prior to discharge," end quote.

In a motion for directed verdict, the Court must look at the evidence most favorable to the parties opposing the motion for directed verdict. And so the Court takes Queen's Medical Center bill in the light most favorable to April Ho.

And the Court finds because of the notation that entry 00069 time discharge 10:15 as having been discharged, that she paid the Queen's Hospital bill, and the Court views that evidence as conclusive of payment.

With regard to the chiropractic bill from Dr. Gina Whest, which plaintiff testified was about $6,200, the Pacific Rehabilitative Services [the] charges for physical ... therapy, which was approximately [$]4,100, and the diagnostic tests by Aloha Diagnos-

tic where the total charged to April Ho was approximately a $1,100 bill, the Court finds that there was no evidence of payment.

All of these factors are relevant to an interpretation of Hawaii Revised Statues section 431[:]C–306 (2)(b). Two subparts referenced to A and B, and the statute reads th[u]s, that the medical rehabilitative tort threshold is met if the amount paid for approved [sic: presumably a transcription error intended to read "or accrued"] exceeds, and in this instance it has to exceed $10,000. The Court totaled the charges and that exceeds $10,000.

It reads that the expenses paid shall be presumed to be reasonable and necessary in establishing the medical rehabilitative limit.

The only expense deemed paid is the $340 to the Queen's Medical Center. So the question is, whether or not there has been sufficient evidence that there were reasonable and necessary expenses incurred in the treatment of Ms. Ho.

The defense has cited to various cases and has distinguished *Walsh versus Chan* where evidence had been introduced of the testimony that the expenses were reasonable and necessarily incurred.

And in this particular case, there has been no evidence by any doctors that the expenses were reasonably incurred.

Therefore, it is necessary to rely on the presumption provided by the statute, and so long as the amount which exceeds the statute was paid, the Court can make the presumption; however, based on what the Court had indicated, that all the charges were charged and incurred, but not proved paid, there has been an insufficient showing that the tort threshold has been met.

Exclusive of the tort threshold, there still needs to be evidence introduced into trial upon which the fact finder can make certain determinations. And Court notes that there hasn't been sufficient evidence produced to the jury, and so the Court grants the defendant's motion for directed verdict.

On November 26, 1996, Ho filed a motion for a new trial, which was denied by order filed on December 13, 1996. Ho's timely appeal followed.

## II. STANDARDS OF REVIEW

### A. Granting Of A Directed Verdict

When we review the granting of a directed verdict, we apply the same standard as the trial court. *Lussier v. Mau–Van Dev., Inc.,* 4 Haw.App. 359, 372, 667 P.2d 804, 815 (1983).

> [A] directed verdict may be granted only when after disregarding conflicting evidence, giving to the [non-moving party's] evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in [the non-moving party's] favor, it can be said that there is no evidence to support a jury verdict in his [or her] favor.

*Wakabayashi v. Hertz Corp.,* 66 Haw. 265, 271, 660 P.2d 1309, 1313 (1983) (quoting *Stewart v. Budget Rent–A–Car Corp.,* 52 Haw. 71, 77, 470 P.2d 240, 244 (1970) (citations omitted)).

*Tabieros v. Clark Equip. Co.,* 85 Hawai'i 336, 350, 944 P.2d 1279, 1293 (1997) (quoting *Weinberg v. Mauch,* 78 Hawai'i 40, 49–50, 890 P.2d 277, 286–87, *reconsideration denied,* 78 Hawai'i 421, 895 P.2d 172 (1995) (brackets in original)). *See also Takayama v. Kaiser Found. Hosp.,* 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996); *Carr v. Strode,* 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995).

### B. Denial Of Motion For New Trial

" 'Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion.' " *Kawamata Farms v. United Agri Products,* 86 Hawai'i 214, 251, 948 P.2d 1055, 1092 (1997) (quoting *United States Steel Corp.,* 82 Hawai'i at 54, 919 P.2d at 316 (citations and internal quotation marks omitted)). " 'A . . . court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.' " *Abastillas v. Kekona,* 87 Hawai'i 446, 449, 958 P.2d 1136, 1139 (1998) (quoting *Kawamata Farms,* 86 Hawai'i at 241, 948 P.2d at 1082).

### C. Interpretation Of A Statute:

"[T]he interpretation of a statute . . . is a question of law reviewable *de novo.*" *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara,* 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura,* 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied,* 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata,* 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied,* 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto,* 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .
>
> In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1983) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. On avenue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998) (quoting *State v. Cullen,* 86 Hawai'i 1, 8–9, 946 P.2d 955, 963–64 (1997) (some brackets in original and some added)).

## III. *DISCUSSION*

As her first point of error on appeal, Ho contends that the circuit court erred in failing to construe the "medical-rehabilitative limit" of HRS § 431:10C–306(b)(2)(A) as a jurisdictional limit that must be challenged before trial or waived. Ho bases her argument on the following language from *Stevens v. Kirkpatrick,* 82 Hawai'i 91, 919 P.2d 1003 (App.1996):

> The intent of the legislature in establishing the medical-rehabilitative limit in the no-fault law was to provide a jurisdictional requirement similar to the $10,000 jurisdictional amount in diversity suits in the federal court: "In order to maintain an action, the claimant must show that the amount in controversy exceeds $5,000 (this amount being intended by your committee to be a jurisdictional requirement similar to the $10,000 jurisdictional requirement in federal diversity suits)." Hse. Stand. Comm. Rep. No. 187, 1973 House Journal, at 837.

*Id.* at 95, 919 P.2d at 1007 (quoting *Walsh v. Chan,* 80 Hawai'i 188, 192, 907 P.2d 774, 778 (App.1995), *aff'd in part and rev'd in part,* 80 Hawai'i 212, 908 P.2d 1198 (1995)). From the above-quoted starting point, however, Ho's reasoning takes an inexplicable turn. Notwithstanding the statement in Hawai'i Rules of Civil Procedure (HRCP) Rule 12(h)(3) that *"[w]henever* it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court *shall* dismiss the action" (emphases added), Ho claims that "[i]f the DefendantAppellee had a challenge to the jurisdictional amount then it needed to be made prior to trial under the direction of *Walsh.*"

■ Ho contends that this conclusion is the necessary result of the observation, frequently made in federal cases analyzing the "amount in controversy" requirement, that the allegations on the face of the complaint control the amount in controversy unless it can be shown "to a legal certainty that the claim is really for less than the jurisdictional amount." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 877 (3d Cir.1995); *see also, Department of Recreation & Sports of Puerto Rico v. World Boxing Association,* 942 F.2d 84, 88 (1st Cir.1991); *Jeter v. Jim Walter Homes, Inc.,* 414 F.Supp. 791, 792 (W.D.Okla.1976); *Burke Co. v. Hilton Dev. Co.,* 802 F.Supp. 434, 436 (N.D.Fla.1992). However, the foregoing cases are distinguishable. In all of them, the plaintiff's claims for relief were dismissed on the basis of the pleadings alone, without affording the plaintiff any evidentiary opportunity whatsoever to prove the sufficiency of the monetary threshold. Ho, by contrast, was afforded a full opportunity to develop the evidence supporting her case at trial. Accordingly, she may no longer merely rely on allegations of accrued expenses that purport to satisfy the jurisdictional threshold amount, but, rather, must bear the burden of proving all of the elements of her case. *See Parker,* 68 Haw. at 561, 722 P.2d at 1031 ("[M]eeting the threshold requirement is an essential condition and element of [a plaintiff's] cause of action."); *Reinhardt v, County of Maui,* 23 Haw. 524, 527 (1916) ("In the absence of a showing that by reason of his injuries, received in the manner alleged, the plaintiff necessarily ... obtain[ed] medical services and that the charges therefor were reasonable ... the evidence [of expenses] objected to was incompetent.").

■ It is apparent from the record before us that Ho's claim is for less than the amount required by HRS § 431:10C–306, inasmuch as she has not established that the expenses to which she testified—other than the ex-

penses that she incurred at Queen's Medical Center Emergency Room—were reasonable or necessarily related to the injuries she received in the May 28, 1994 accident. Ho could have made such a showing pertaining to the other expenses that she claimed in two ways. She failed to do either.

■ First, as the circuit court correctly observed, pursuant to the provisions of HRS § 431:10C-306, Ho's expenses would have been presumed reasonable and necessarily related to the injuries Ho received in the subject automobile accident had she offered any evidence that she had actually *paid* them. The statute permits calculation of expenses for the purpose of satisfying the threshold requirement either on the basis of those already paid or those merely accrued. It extends a presumption that medical expenses are reasonable and necessary *only* to those expenses that have actually been paid. "The long-accepted canon, *espressio unius est exclusio alterius*, meaning that the mention of one thing implies the exclusion of another," persuades us that the distinction was not unintended. *See Korean Buddhist Temple*, 87 Hawai'i at 233, 953 P.2d at 1331; *Fought & Company v. Steel Eng'g & Erection, Inc.*, 87 Hawai'i 37, 55, 951 P.2d 487, 505 (1998); *Kawamata Farms*, 86 Hawai'i at 232, 948 P.2d at 1073; *State v. Cornelio*, 84 Hawai'i 476, 495 n. 33, 935 P.2d 1021, 1038–39 n. 33 (1997); *State v. Arceo*, 84 Hawai'i 1, 29 n. 38, 928 P.2d 843, 872 n. 38 (1996); *Richardson v. City & County of Honolulu*, 76 Hawai'i 46, 56–57, 868 P.2d 1193, 1203 (1994). Because the legislature expressly designated that expenses both "paid or accrued" should be included in the calculation of the jurisdictional threshold, we must infer that it intentionally declined to apply the presumption of reasonableness and necessity to expenses merely "accrued"—as opposed to those actually "paid"—when it crafted the presumption two sentences later in *the same statute* without specifically enumerating "accrued" expenses. Furthermore, the legislative history supports an interpretation of HRS § 431:10C-306 that affords the presumption *only* to medical expenses that have been "paid."

HRS § 431:10C-306 was enacted as part of a major revision of Hawaii's motor vehicle insurance laws as they related to tort liability arising out of the ownership and use of motor vehicles. Sen. Stand. Comm. Rep. No. 402, in 1973 Senate Journal, at 817. The Senate Standing Committee on the Judiciary explained the need for the new legislation as follows:

The theory of removing fault or accountability from the settlement of the accident damage situation has been sold to the public as the only method of reducing auto insurance costs.

In its effort to remove fault from the accident reparations situation, your Committee has striven in addition to remove the punishment aspect, the retribution or vengeful, the moralistic or "eye for an eye"[ ] aspects, from the settlement process. The attempt was to make it more of a baseball game. After the game[,] each player goes home and puts on his own band aid and washes his own uniform. When his ball wears out, he replaces his own ball. He does not look to the other players or to the home run king of the league to replace his balls. Likewise, as in the ball game, we have made a change, by the switch to no-fault, in that, the rules are now to be the same with all parties to an accident. Our object was to eliminate the *subterfuge and* the *fraud* induced by the public's mass of experience with auto insurers and *with each other*. Your committee doubts that there is a citizen alive who has not had at least vicarious experience, via another member of the family, with what the family defined as a short changing by an auto insurer. It is equally unbelievable that a citizen exists who has not had the experience of returning to a parked car to find hit-skip damage to his auto. Hence, the *subterfuge*. Hence, the *inflated claims*. What we see here is the American ghetto's response to the police officer. In these premises: it is the auto insurer serving as the cop, and we are all in its ghetto. Auto owners collectively are the insurer's oyster.

And this *object of removing the inflated claims*, the subterfuge, and the fault concept, has as its ultimate objective the re-

duction of costs in automobile insurance. For it is the fault and attendant inflationary influences which have contributed heavily but not singly, to the escalation in auto insurance rates.

*Id.* at 817–18 (emphases added).

Clearly, the legislature intended to address the problem of claim "padding" in order to reduce the costs associated with the settlement of tort liability claims resulting from auto accidents. The device of creating a presumption that *paid* medical expenses are reasonable and necessary, but requiring proof that *accrued but unpaid* medical expenses used to satisfy the tort liability threshold actually satisfy the statutory requirement serves this end by requiring the potential tort plaintiff to "put his money where his mouth is," so to speak. By expending his or her own resources to acquire medical services, the tort plaintiff demonstrates his or her conviction that the fees charged were reasonable and the services rendered were necessary to his or her treatment. When a plaintiff has not paid for his or her care, the specter of medical charges that have been intentionally inflated in order to boost the plaintiff's recovery of damages—and for which there is no expectation of payment—arises. Accordingly, the legislature mandated that a plaintiff must prove that any *unpaid* medical expenses incurred within the context of a motor vehicle accident were reasonable and necessary.

Despite Ho's claims to the contrary, requiring a motor vehicle tort plaintiff to make the aforementioned showing is not inconsistent with the rationale of *Walsh*. There, the plaintiff's treating physician testified specifically that the charges for medical treatment "were reasonable and necessary as a result of the injuries from the subject automobile accident." 80 Hawaiʻi at 190, 907 P.2d at 776. No such testimony was adduced in the instant case.

■ Finally, Ho contends that the evidence adduced at trial was sufficient to provide a factual basis for the jury to determine that the damages she sustained were the result of the accident. Her argument is not persuasive. She urges:

> Where the patient testifies that the treatment was an assistance in recovery and the doctor testifies that the rehabilitation services and the testing were part of the treatment decision that the doctor made this is direct testimonial evidence of the reasonableness and necessity sufficient to support a jury's consideration of this issue.

Her position is contrary to the Hawaiʻi Rules of Evidence (HRE).

■ HRE Rule 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The need for personal knowledge is underscored by HRE Rule 701, which provides that "[i]f [a] witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are . . . rationally based on the perception of the witness." Inasmuch as the question whether a specific treatment modality was reasonable and necessary is not within the personal knowledge of a lay witness, it must be testified to by experts.

It is in the nature of the human body, or any other living organism, to heal itself. A lay witness has no personal knowledge or perception that may form a basis from which a rational differentiation between normal healing processes and the effects of purported medical treatment may be made. The chiropractic treatment and physical therapy Ho received *may* have contributed to her recovery from the effects of the automobile accident caused by Leftwich. It also may have had little or no effect whatsoever—a possibility that becomes a likelihood where, as here, the patient returned to dancing before she underwent either the testing that was purportedly ordered to evaluate her fitness to do so or the physical therapy that was allegedly intended "to ease" her return to dance. The relationship between the treatments Ho received and her injuries sustained in the May 28, 1994 accident—as distinguished from any other injuries or the "normal wear and tear" that she may have sustained as a result of the strenuous dance activities in which she testified that she had participated—were not within Ho's personal

knowledge and could not have been rationally inferred based only on her own perception. Accordingly, pursuant to HRE Rules 602 and 701, the reasonableness and necessity of Ho's treatment could only be established by expert testimony.

Inasmuch as (1) reasonableness and necessity were elements of the prima facie case that Ho had the burden of establishing and (2) Ho failed to establish these elements by competent expert testimony, Ho adduced insufficient evidence at trial upon which a jury could have based an award of damages in her favor. Accordingly, the circuit court neither erred in entering a directed verdict in Leftwich's favor nor abused its discretion in denying Ho's motion for a new trial.

## IV. *CONCLUSION*

Because Ho neither presented (1) evidence that the medical expenses that she claimed in her motor vehicle tort lawsuit against Leftwich were paid, thereby triggering the statutory presumption that they were reasonable and necessary, nor (2) expert testimony establishing that the expenses were reasonable and necessary, we hold that she did not satisfy the minimum level of qualifying expenses necessary to maintain her action pursuant to the provisions of HRS § 431:10C–306. Accordingly, we affirm the circuit court's judgment and order denying her motion for new trial.