978 P.2d 718

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Sean K. CARVALHO, Defendant–Appellee.**

**No. 21701.**

Supreme Court of Hawai'i.

May 20, 1999.

Linda C.R. Jameson, Deputy Public Defender, on the brief, for the defendant-appellant Sean K. Carvalho

Bryan K. Sano, Deputy Prosecuting Attorney on the brief, for the plaintiff-appellee State of Hawai'i

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Sean Carvalho appeals from that portion of the judgment of the first circuit court, filed on June 12, 1998, sentencing Carvalho to an extended term of twenty years. Carvalho argues that the circuit court erred in: (1) failing to recognize Carvalho's right to presentence allocution; and (2) relying on unsubstantiated allegations to impose an extended term sentence. Carvalho's second point of error is without merit. However, we agree with Carvalho's first point of error. Accordingly, we vacate that portion of the circuit court's judgment sentencing Carvalho and remand for resentencing before a different judge.

## I. BACKGROUND

On September 21, 1995, a complaint was filed against Carvalho, charging him with the offense of murder in the second degree, in violation of HRS § 707–701.5 (1993).[1] Carvalho was charged with having intentionally or knowingly caused the death of his grandmother by striking her with a baseball bat on September 5, 1995. A jury subsequently found Carvalho guilty of "manslaughter

---

1. HRS § 707–701.5 provides in relevant part: "**Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

based upon reckless conduct," pursuant to HRS § 707–702 (1993).[2]

Carvalho's sentencing hearing was set for March 20, 1998. On February 17, 1998, the prosecution filed a motion for extended term of imprisonment, pursuant to HRS § 706–662(5) (1993 & Supp.1998).[3] Also on February 17, the prosecution filed a motion for assessment of dangerousness, pursuant to HRS § 706–662(3).

On March 6, 1998, the circuit court conducted a hearing on the prosecution's motion for assessment of dangerousness. The defense objected to the motion on the grounds that Carvalho's juvenile record lacks any basis for supporting a finding of dangerousness. The defense also noted that, inasmuch as Carvalho's twenty-second birthday fell on March 27, 1998, if sentencing were to be delayed beyond that date in order for the prosecution to complete an assessment of dangerousness, Carvalho would no longer be eligible for sentencing pursuant to the "young adult defendants statute," HRS

§ 706–667 (1993 & Supp.1998).[4] The circuit court granted the prosecution's motion, but noted that it would not move the sentencing date unless the prosecution moved for a continuance.

On March 17, 1998, the prosecution filed a motion for continuance of sentencing, which was heard on March 20, 1998. Following a colloquy with the prosecution and the defense, the circuit court addressed the defense's concerns as follows:

> Okay. Last time, ... you had raised an interesting question, that if we do postpone this sentencing beyond March 27th[, Carvalho] would not be 22 at the time of sentencing.
>
> So—well, let me say for the record that I've received a presentence report in this case, and I've read it. I also received this morning two fax letters from Judy Ruis Verhoek and Aida R. Silva, who are relatives of the victim in this case.... Then I also reviewed an addendum to the presen-

---

2. HRS § 707–702 provides in relevant part: "**Manslaughter.** (1) A person commits the offense of manslaughter if: (a) He recklessly causes the death of another person[.]"

3. HRS § 706–662 provides in relevant part:
 **Criteria for extended terms of imprisonment.** A convicted defendant may be subject to an extended term of imprisonment under section 706–661, if the convicted defendant satisfies one or more of the following criteria:
 . . . .
 (3) The defendant is a dangerous person whose imprisonment for an extended term is necessary for protection of the public. The court shall not make this finding unless the defendant has been subjected to a psychiatric or psychological evaluation that documents a significant history of dangerousness to others resulting in criminally violent conduct, and this history makes the defendant a serious danger to others.
 . . . .
 (5) The defendant is an offender against the elder, handicapped, or minor under the age of eight whose imprisonment for an extended term is necessary for the protection of the public. The court shall not make this finding unless:
 (a) The defendant attempts or commits any of the following crimes: murder, manslaughter, a sexual offense that constitutes a felony under chapter 707, robbery, felonious assault, burglary, or kidnapping; and
 (b) The defendant, in the course of committing or attempting to commit the crime, in-

flicts serious bodily injury upon a person who is:
(i) Sixty years of age or older; ... and
(c) Such disability is known or reasonably should be known to the defendant.

4. HRS § 706–667 provides in relevant part:
 **Young adult defendants.** (1) Defined. *A young adult defendant is a person convicted of a crime who, at the time of sentencing, is less than twenty-two years of age* and who has not been previously convicted of a felony as an adult or adjudicated as a juvenile for an offense that would have constituted a felony had the young adult defendant been an adult.
 (2) Specialized correctional treatment. A young adult defendant who is sentenced to a term of imprisonment which may exceed thirty days may be committed by the court to the custody of the department of public safety, shall receive, as far as practicable, such special and individualized correctional and rehabilitative treatment as may be appropriate to the young adult defendant's needs.
 (3) Special term. A young adult defendant convicted of a felony may, in lieu of any other sentence of imprisonment authorized by this chapter, be sentenced to a special indeterminate term of imprisonment if the court is of the opinion that such special term is adequate for the young adult defendant's correction and rehabilitation and will not jeopardize the protection of the public.
 (Emphasis added.)

tence diagnosis and report dated March 16th, 1998, dealing with restitution matters and firearms compliance.

Now, frankly, . . . having reviewed all of these materials, were I to sentence [Carvalho] today, I would probably—I would in fact deny a request for sentencing as a young adult offender.

And let me just state my reasons for the record. And to tell you what I'm going to do in this case, I'm going to grant the motion to continue. But I want to state my reasons for the youthful offender denial at this point in time just to—just because of the issue that [the defense] raised, . . . I want to do it now rather than when it's too late.

And then if I do it now, you can consider it as a ruling on your request for youthful offender sentencing. And then maybe that will give you an opportunity to move for reconsideration later on if you feel it justified, given that I am going to continue this matter. So if you come up with something else it might change my mind. And even though the date has passed, maybe you can move for reconsideration.

The circuit court proceeded to discuss Carvalho's character and concluded as follows:

So considering all of this, I am not prepared to say that five years in prison, given the current availability of rehabilitative programs there, is enough either to rehabilitate [Carvalho] or to remove the substantial risk of danger to the public that he now presents. Those are my reasons for denying the request for sentencing as a young adult defendant.

The circuit court did not offer Carvalho an opportunity to speak during these proceedings. The circuit court postponed sentencing in order to provide the prosecution's expert time to complete the assessment of dangerousness.[5]

On June 12, 1998, the circuit court conducted Carvalho's sentencing hearing. The prosecution called Harold Hall, Ph.D., a psy-

chologist, to testify regarding the dangerousness assessment he had performed on Carvalho. Dr. Hall related that Carvalho had declined psychological testing, but that Dr. Hall had been able to construct an assessment from a "database" that included police reports, trial testimony, sanity commission reports, the presentence diagnosis and report, a tape-recorded interview of Carvalho, a neuropsychology report, and interviews with two witnesses. Dr. Hall opined as follows:

Well, in my opinion, [Carvalho] is dangerous to others and he does—and this is based on a significant history of violence and a dangerousness resulting in criminally violent conduct and the direction of dangerousness is more towards others than self or property. And in coming to this conclusion I looked at history, triggers to aggression, inhibitory kinds of things that would hold aggression in check for the defendant which were generally weak in nature, and the substance use which was a big factor, the progressive brain disease that has been diagnosed by several individuals, and all these things—the projection of blame and the lack of remorse, putting all these things together suggest[s] a serious danger to others in the foreseeable future.

Following extensive examination of Dr. Hall and brief statements by the prosecution and the defense, the circuit court asked Carvalho if he wished to speak. Carvalho apologized to his grandmother's friends and loved ones.

The circuit court then proceeded with sentencing:

As to the motion for extended term, I've got to make a couple of findings at least. First, that [Carvalho] is a dangerous person. I will find that [Carvalho] has been subjected to a psychological evaluation that documents a significant history of dangerousness to others, resulting in criminally violent conduct, and I note that—and I think Dr. Hall's understanding of a signifi-

---

**5.** The circuit court also ruled that HRS § 606–662(5), *see supra* note 3, did not apply to Carvalho, because manslaughter was not one of the enumerated offenses that fell within the subsection's purview at the time of the offense. The

offense of manslaughter was not added to HRS § 706–663(5)(a) until April 10, 1996, *see* 1996 Haw. Sess. L. Act 3, which was *after* the commission of Carvalho's offense.

cant history is the same as mine, that significant history can consist in one recorded event. And secondly, I would find that the history makes [Carvalho] a serious danger to others. I do find beyond a reasonable doubt that [Carvalho] is a dangerous person within the meaning of HRS [§ ] 706–662(3).

As to the need for an extended term in this case, I will make the following findings: [Carvalho] killed his grandmother with a baseball bat. Nothing the evidence shows she might have done to him at any time during his life justifies, excuses, or mitigates what he did to her. For some [ ] time before the killing, he was abusing alcohol and drugs, including crystal methamphetamine. He was hearing voices and experiencing hallucinations. He has a significant long[-]term ongoing history of behavioral difficulty manifesting in violent acting out, including fire[-]setting, cruelty to animals, aggressiveness, and impulsivity.

During his incarceration at the Oahu Community Correctional Center after his arrest in this case, he was kept in therapeutic lockdown and prescribed antipsychotic medication for agitation, hallucination, hearing voices, and talking about Satan. He was involved in fights with other inmates at least three times, the last being in September of 1996. He has been diagnosed as suffering from amphetamine dependence, alcohol dependence, antisocial personality disorder, and dementia due to substance abuse. . . .

In summary, the evidence indicates that [Carvalho] has very serious substance abuse and mental health problems and a demonstrated capacity for sudden extreme violence. I feel in a lot of ways . . . that it's a very emotional case, it's a very sad case. [Carvalho] had a difficult childhood from the evidence that I heard during the trial, but the sad thing is the issue, as far as the extended term is concerned, is not so much mitigation how he came to be the way he is but that he is the way he is and my concern must be with the protection of the community.

In view of all the evidence, I find that [Carvalho's] imprisonment for an extended term is necessary for the protection of the public, and consistent with that finding, the defendant is committed to the custody of the Director of Public Safety for a period of 20 years; mittimus to issue forthwith.

The circuit court's judgment, guilty conviction and sentence, was filed on June 12, 1998. Carvalho filed a timely notice of appeal on July 10, 1998.

## II. STANDARDS OF REVIEW

### A. Sentencing

■ "The authority of a trial court to select and determine the severity of a penalty is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory or constitutional commands have not been observed." *State v. Valera*, 74 Haw. 424, 439, 848 P.2d 376, 383, *reconsideration denied*, 74 Haw. 650, 853 P.2d 542 (1993). *State v. Davia*, 87 Hawai'i 249, 253–54, 953 P.2d 1347, 1351–52 (1998) (quoting *State v. Cornelio*, 84 Hawai'i 476, 483, 935 P.2d 1021, 1028 (1997) (quoting *State v. Gaylord*, 78 Hawai'i 127, 143–44, 890 P.2d 1167, 1183–84 (1995))).

### B. Interpretation Of A Statute

■ "[T]he interpretation of a statute . . . is a question of law reviewable *de novo*." *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied*, 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata*, 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied*, 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). *Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto*, 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997).

Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawaiʻi at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawaiʻi 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Dudoit,* 90 Hawaiʻi 262, 266–267, 978 P.2d 700, 703–704 (1999) (quoting *State v. Stocker,* 90 Hawaiʻi 85, 90–91, 976 P.2d 399, 404–05 (1999) (quoting *Ho v. Leftwich,* 88 Hawaiʻi 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawaiʻi 217, 229–30, 953 P.2d 1315, 1327–28 (1998)))).

C. *Constitutional Law*

■ . . . We answer questions of constitutional law "by exercising our own independent judgment based on the facts of the case." *State v. Trainor,* 83 Hawaiʻi 250, 255, 925 P.2d 818, 823 (1996) (citations and internal quotation marks omitted); *State v. Lee,* 83 Hawaiʻi 267, 273, 925 P.2d 1091, 1097 (1996) (citation, internal quotation marks, and brackets omitted). Thus, we review questions of constitutional law under the "right/wrong" standard. *See State v. Toyomura,* 80 Hawaiʻi 8, 15, 904 P.2d 893, 900 (1995) (citing *State v. Higa,* 79 Hawaiʻi 1, 3, 897 P.2d 928, 930 (1995), and *State v. Gaylord,* 78 Hawaiʻi 127, 137, 890 P.2d 1167, 1177 (1995)); *State v. Baranco,* 77 Hawaiʻi 351, 355, 884 P.2d 729, 733 (1994) (issue whether defendant's constitutional right against double jeopardy would be violated unless indictment dismissed is question of law, reviewed under right/wrong standard); *In re [John] Doe, Born on January 5, 1976,* 76 Hawaiʻi 85, 93, 869 P.2d 1304, 1312 (1994) (whether speech is protected by first amendment to United States Constitution is applied to states through fourteenth amendment and by article I, section 4 of Hawaiʻi Constitution are questions freely reviewable on appeal).

*State v. Quitog,* 85 Hawaiʻi 128, 139, 938 P.2d 559, 570 (1997) (quoting *State v. Arceo,* 84 Hawaiʻi 1, 11, 928 P.2d 843, 853 (1996)).

### III. *DISCUSSION*

A. *The District Court Erred By Failing To Accord Carvalho His Right Of Presentence Allocution.*

■ Carvalho argues that, on March 20, 1998, "the [sentencing] court erred in denying [his] request for sentencing as a Young Adult Offender[, pursuant to HRS § 706–667,] without granting [him] the right of allocution." Allocution has been defined as "the defendant's right to speak before sentence is imposed." *State v. Chow,* 77 Hawaiʻi 241, 246, 883 P.2d 663, 668 (App.1994) (citation and internal quotation signals omitted). HRS § 706–604 (1993) provides that, "[b]efore imposing sentence, the court shall afford a *fair opportunity to the defendant to be heard* on the issue of the defendant's disposition." (Emphasis added.) Similarly, Hawaiʻi Rules of Penal Procedure (HRPP) Rule 32(a)

provides that, "[b]efore suspending or imposing sentence, the court shall address the defendant personally and *afford a fair opportunity to the defendant ... to make a statement and present any information in mitigation of punishment.*" (Emphasis added.) "Moreover, pre-sentence allocution has been recognized as a due process right under the Hawai'i Constitution." *Davia,* 87 Hawai'i at 255, 953 P.2d at 1353 (citing *Chow,* 77 Hawai'i at 246–247, 883 P.2d at 668–669).

The prosecution contends that "[t]he court was not sentencing [Carvalho] at the March 20th hearing" and that "[Carvalho's] right to allocution was exercised [ ] before he was sentenced on June 12, 1998." The prosecution fails to recognize, however, that a court's consideration of the "young adult defendants statute" *is* an element of sentencing. *See* commentary on HRS § 706–667 (1993) (noting that the purpose of the statute is to provide "a flexible approach in *sentencing*" (emphasis added)); *see also State v. Lau,* 73 Haw. 259, 262, 831 P.2d 523, 525 (1992) (observing that, "[o]nce the court determines that imprisonment is necessary, the court 'is free ... to choose' between the ordinary term or the special indeterminate *sentence* under the young adult defendants statute" (citing commentary on HRS § 706–667) (emphasis added)). The circuit court made a *sentencing* determination, therefore, when, on March 20, 1998, it denied Carvalho's request for sentencing as a young adult without giving Carvalho a chance to speak.

■ A prime reason for allowing a defendant the right of allocution "is to provide the defendant an opportunity to plead for mitigation of the sentence." *DeAngelo v. Schiedler,* 306 Or. 91, 757 P.2d 1355, 1358 (1988); *see also State v. Reynolds,* 80 Ohio St.3d 670, 687 N.E.2d 1358, 1372 (1998), *cert. denied* —— U.S. ——, 118 S.Ct. 2328, 141 L.Ed.2d 702 (1998) (noting that "[t]he purpose of allocution is to permit the defendant to speak on his [or her] own behalf or present any information in mitigation of punishment"). Carvalho lost his opportunity to plead for one type of mitigation once the circuit court refused to apply the young adult

defendants statute. While Carvalho was accorded an opportunity to speak on June 12, 1998, prior to the "imposition" of his final sentence, a significant sentencing determination had been reached long before—on March 20, 1998—without the requisite contribution from Carvalho. Such a situation is untenable. A defendant's right of allocution is designed to provide an opportunity to affect the totality of the trial court's sentencing determination. The right of presentence allocution would become illusory if judges were permitted to construct a sentence one brick at a time, only permitting the defendant to speak before the last piece of the wall was about to be mortared in place. Accordingly, we hold that a sentencing court must afford a defendant his or her right of presentence allocution *before* ruling on the applicability of the young adult defendants statute.

■ The prosecution suggests that Carvalho's right of allocution was not affected at the March 20, 1998, hearing because the circuit court preserved the young adult defendant sentencing option by noting that Carvalho could move for reconsideration. This court has observed, however, that "[o]nce a defendant is denied the opportunity to be heard, [the] denial of due process cannot be corrected later at a motion for reconsideration." *Schutter v. Soong,* 76 Hawai'i 187, 208, 873 P.2d 66, 87 (1994); *see also Chow,* 77 Hawai'i at 246, 883 P.2d at 668 (noting that allowing a defendant to speak after a sentence was imposed "did not remedy the failure to afford [the defendant] 'a fair opportunity ... to be heard on the issue of his disposition' before sentence" (citing HRPP Rule 32(a))). It follows that the circuit court's suggestion—that Carvalho might move for reconsideration of the court's refusal to apply the young adult defendants statute—did not remedy the failure to afford Carvalho an opportunity to speak in the first instance. We hold that denying Carvalho a fair opportunity to be heard on the potential application of the young adult defendants statute violated his right of presentence allocution.[6]

---

6. We note that the remedy for the circuit court's denial of Carvalho's right of allocution is resen-

tencing, and not retrial. *See Schutter,* 76 Ha-

B. *The Circuit Court Did Not Commit An Abuse Of Discretion In Sentencing Carvalho To An Extended Term Of Imprisonment.*

 Carvalho next urges that "the lower court abused its discretion because it relied on uncharged offenses and therefore incompetent evidence in imposing an extended term of imprisonment." We address Carvalho's argument in order to provide guidance to the sentencing court on remand. Because "'[e]ach of the subsections of [HRS] § 706–662 requires the trial court to engage in a *two*-step process to impose a sentence for an extended term,'" *State v. Loa*, 83 Hawai'i 335, 354, 926 P.2d 1258, 1277, *reconsideration denied*, 83 Hawai'i 545, 928 P.2d 39 (1996) (quoting *State v. Huelsman*, 60 Haw. 71, 76, 588 P.2d 394, 398 (1978)) (brackets in original) (emphasis added), we disagree.

It has been the longstanding view of this court that the sentencing court should apply the following procedure when contemplating an extended term sentence:

"The first step involves a finding by the court that the defendant is within the class of offenders to which the particular subsection applies." [ ]*Huelsman*, 60 Haw. [at] 76, 588 P.2d [at] 398[ ]; *see also Okumura*, 78 Hawai'i [383,] 412, 894 P.2d [80,] 109 [ (1995) ]; *State v. Schroeder*, 76 Hawai'i 517, 527, 880 P.2d 192, 202 (1994). "[T]he . . . rules of evidence apply to the proof of such facts in an extended term sentence hearing. . . ." *Huelsman*, 60 Haw. at 77, 588 P.2d at 399 (citing *State v. Kamae*, 56 Haw. 628, 548 P.2d 632 (1976)). The second phase of the process requires the sentencing court to "determine that the defendant's commitment for an extended term is necessary for the protection of the public." *Schroeder*, 76 Hawai'i at 527 & n. 17, 880 P.2d at 202 & n. 17 (citation and internal quotation signals omitted); *see also Huelsman*, 60 Haw. at 77, 588 P.2d at 398–399. "'The procedural standards to which the second phase of an extended term sentence proceeding should be subject are those applicable to ordinary sentencing.'" *Schroeder*, 76 Hawai'i at 528, 880 P.2d at

wai'i at 208, 873 P.2d at 87; *Chow*, 77 Hawai'i at

203 (quoting *Huelsman*, 60 Haw. at 80, 588 P.2d at 400).

*Loa*, 83 Hawai'i at 354, 926 P.2d at 1277 (some brackets added and some in original) · (ellipses in original).

The first step of the extended term sentencing process in this matter—the establishment of Carvalho's status as a "dangerous person" pursuant to HRS § 706–662—involved "'facts [to] be established by proof beyond a reasonable doubt in a hearing where the ordinary rules of evidence apply.'" *State v. Villeza*, 85 Hawai'i 258, 275, 942 P.2d 522, 539 (1997) (quoting *State v. Morishige*, 65 Haw. 354, 367, 652 P.2d 1119, 1129 (1982)). The evidence at Carvalho's extended term hearing consisted of the testimony of Dr. Hall. The circuit court based its finding that Carvalho was a dangerous person on Dr. Hall's psychological evaluation. It is uncontested that Dr. Hall was permissibly allowed to testify as an expert in psychology. The basis of Dr. Hall's testimony was of the sort "reasonably relied upon by experts in the field of clinical psychology to form an opinion as to serious dangerousness." *See Villeza*, 85 Hawai'i at 274, 942 P.2d at 538 (finding an expert's review of records, interviews, and reports sufficient in his development of a dangerousness assessment). Dr. Hall was competent to testify, the foundation for his testimony was properly laid, and his testimony established a history of Carvalho's violence. We cannot hold, therefore, that the circuit court abused its discretion in finding that Dr. Hall's testimony constituted proof beyond a reasonable doubt that Carvalho had "a significant history of dangerousness to others resulting in criminally violent conduct," pursuant to HRS § 706–662(3).

 Carvalho protests that the circuit court relied on unsubstantiated evidence in its imposition of an extended term sentence. The circuit court's remarks upon such evidence were relevant, however, only to the second phase of the two-step extended term sentencing process, *i.e.*, the determination as to whether commitment for an extended term was "necessary for the protection of the public." In contrast to the procedural standard required by the first step, the second

248, 883 P.2d at 670.

step requires only the procedures employed in ordinary sentencing. "Under ordinary sentencing procedures, the court is 'afforded wide latitude in the selection of penalties from those prescribed and in the determination of their severity.'" *Okumura*, 78 Hawai'i at 413, 894 P.2d at 110 (quoting *State v. Johnson*, 68 Haw., 292, 296, 711 P.2d 1295, 1298 (1985)).

Specifically, Carvalho suggests that, inasmuch as "[t]he court noted Carvalho's past history of fire[-]setting, cruelty to animals and Dr. Hall's summary of unreported violence,"[7] these allegations should have been proven beyond a reasonable doubt. Inasmuch as the sentencing court must consider a defendant's "history and characteristics," pursuant to HRS § 706–606 (1993),[8] the circuit court was entitled to rely on such allegations as Carvalho's history of fire-setting and cruelty to animals "for the limited purpose of ascertaining [Carvalho's] propensity for acting in a manner that endangered the public 'in determining the particular [enhanced] sentence to be imposed.'" *Loa*, 83 Hawai'i at 355, 926 P.2d at 1278 (determining that the circuit court had not erred in considering police reports and testimonial evidence in imposing extended term sentence) (citing HRS § 706–606 and *State v. Vinge*, 81 Hawai'i 309, 323; 916 P.2d 1210, 1224 (1996) (holding that, "[i]n ascertaining the defen-

dant's "characteristics" for the purposes of HRS § 706–606(1), ... a sentencing court may consider any and all accurate information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed" (citation, internal quotation signals, and emphasis omitted) (ellipsis in original)) (some brackets added and some in original)). Inasmuch as the circuit court in the present matter relied on "unsubstantiated allegations" only in the *second* step of the extended term sentencing process,[9] we hold that it did not err in sentencing Carvalho to an extended sentence.

## IV. CONCLUSION

Based on the foregoing analysis, we vacate that portion of the circuit court's judgment sentencing Carvalho and remand for resentencing *nunc pro tunc*[10] before a new judge.[11]

---

7. The prosecution observes correctly that the trial court did not, in fact, make any reference to the "unreported violence" in its findings when it granted the motion for extended sentencing.

8. HRS § 706–606 provides in relevant part that "[t]he court, in determining the particular sentence to be imposed, shall consider: (1) The nature and circumstances of the offense and the history and characteristics of the defendant...."

9. We likewise reject Carvalho's argument that, by considering uncharged allegations, the circuit court necessarily *punished* him for those alleged offenses. First, we note that the circuit court based its extended term sentence on many allegations that *were* proven beyond a reasonable doubt, including, *inter alia*, the manner in which Carvalho killed his grandmother, Carvalho's history of drug and alcohol abuse, Carvalho's fights while in prison, and the expert diagnosis of Carvalho as suffering from antisocial personality disorder and dementia. Second, the circuit court expressly invoked Carvalho's difficult childhood as a mitigating factor. It is apparent from its extensive remarks that the circuit court's sen-

tencing decision was driven by (1) "the nature and circumstances of the offense" for which Carvalho was being sentenced and (2) Carvalho's dangerous character.

10. The resentencing should be undertaken *nunc pro tunc* as of March 20, 1998, in order that the sentencing judge might consider the application of the young adult defendants statute.

11. It should be noted that we are remanding for resentencing by a different judge because, inasmuch as Judge Perkins previously determined the appropriate length of sentence, remanding the matter to Judge Perkins would constitute an inadequate remedy. *See, e.g., Schutter*, 76 Hawai'i at 208, n. 6, 873 P.2d at 87, n. 6. This should not be construed, however, as any suggestion on our part that Judge Perkins's conducted himself in an inappropriate manner. Judge Perkins conducted himself with decorum and impartiality and erred only by failing to allow Carvalho his right of presentence allocution.